### EGGLESTON *v.* STATE
(Two Appeals in One Record)

[No. 138, October Term, 1955.]

506

*Decided April 6, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Fred Kolodner,* with whom was *Leon J. Rudd* on the brief, for the appellant.

*Alexander Harvey, II, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and

*J. Robert Brown, Assistant State's Attorney,* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This case involves two appeals in one record from orders of the Criminal Court of Baltimore. The appellant had been convicted in two cases of larceny by a Magistrate. On appeal by the appellant here, he was convicted in the Criminal Court and sentenced on March 8, 1955, to six months in the House of Correction in each case, the sentences to run concurrently from February 23, 1955, the date of his original arrest and conviction by the Magistrate. He was referred by the court to the Patuxent Institution for examination and diagnosis to ascertain whether he was a defective delinquent under the provisions of Code (1951), Art. 31B, sec. 6, and was admitted to Patuxent on March 14, 1955. On June 20, 1955, the Director, Dr. Harold M. Boslow, forwarded to the court a written report with findings and a letter recommending that the appellant be committed to the Institution on an indeterminate basis as a defective delinquent.

On July 21, 1955, the appellant was summoned before the court and advised of the findings and conclusion of the Director of the Patuxent Institution. On the same day, Fred Kolodner, Esq. was appointed by the court to represent the appellant in proceedings to determine whether or not he was a defective delinquent. Under the statute it was mandatory upon the court to appoint counsel within twenty days after the summons and service of a copy of the report. Mr. Kolodner requested that the hearing on the issue, originally set by the court for July 22, 1955, be postponed until a later date in order that he might prepare his defense. Here again the statute provided that counsel appointed is entitled to at least thirty days to prepare his case. The court granted the request, and by order dated July 22, 1955, directed that appellant should remain in the custody of the Patuxent Institution pending the final determination of the issue of defective delinquency. Had appellant been confined in the Maryland

House of Correction under the sentence of March 8, 1955, and remained there, that sentence would have expired, assuming the usual time off for good behavior, on July 23, 1955. However, the appellant was in the Patuxent Institution from March 14, 1955, until his case was disposed of except for his appearance in court on July 21, 1955.

On September 28, 1955, the appellant was "arraigned" for hearing upon the report and pleaded "not guilty", electing to be tried by the court. Counsel for the defense introduced reports of Dr. Charen, a psychologist, and Dr. Freedom, a psychiatrist, who had examined the appellant at the request of his counsel and at State expense. Both reports corroborated the findings in the report from the Institution. It was stipulated that the appellant had been convicted in the criminal courts of this State of two or more offenses punishable by imprisonment. In fact, he had had a number of previous convictions. At the conclusion of the hearing, the court found the appellant to be a defective delinquent within the meaning of Art. 31B of the Code, suspended his original sentence to the House of Correction, and committed him to Patuxent Institution for an indefinite period, subject to further order of court. The present appeals are from this order of September 28, 1955, and from the previous order of July 22, 1955.

The new law relating to defective delinquents was enacted by Ch. 476, Acts of 1951, and appears in Code (1951), Art. 31B. Sec. 11 of this Article provides that "From any court order issued under the provisions of Section 9, or of Section 10, there shall be the same right of appeal to the Court of Appeals as after any conviction of felony." Sections 9 and 10 deal with sentences after judicial determinations of defective delinquency, and with judicial determinations on petitions for review of a sentence. Neither of these sections refers to preliminary or interlocutory orders, and they do not in terms authorize an appeal from such orders. Moreover, the type of appeal is analogized to the ordinary criminal appeal. It is well settled that an appeal in a criminal case is premature until after final judgment. *State v. Harman,*

199 Md. 209, 212, and cases cited. The appeal from the order of July 22, 1955, must be dismissed. We may consider the effect of the order, however, on the appeal from the order of September 28, 1955.

The appellant contends that the court lost jurisdiction to determine the issue of defective delinquency because the original sentence expired by lapse of time on August 23, 1955, or on July 23, 1955, if time off for good behavior is allowed. Thus, it is argued that the court had no jurisdiction to try the case on September 28, 1955, and the original sentence to the House of Correction could not be extended by the order of July 22, 1955, remanding him to the Patuxent Institution pending trial.

Sec. 6 provides that on request of the State's Attorney, the Chairman of the Board of Correction, of the defendant, or of his attorney, the court may order an examination by the Institution, or the court may do so on its own initiative. The request must be by petition filed with the court stating the reasons why defective delinquency is suspected or supposed. Such examination may only be ordered if the person to be examined has been convicted and sentenced by a court of this State for a crime or offense in the following categories: a felony, a misdemeanor punishable by imprisonment in the penitentiary, a crime of violence, a sex crime of three defined types, or "two or more convictions for any offenses or crimes punishable by imprisonment, in a criminal court of this State." Sec. 6(c) provides: "Such an examination may be requested and made at any time after the person has been convicted and sentenced for a crime or offense specified hereinabove in this section, provided that said person has been sentenced to a period of confinement in a penal institution or is then serving such a sentence. No such examination shall be ordered or made if the said person has been released from confinement for the particular crime or offense of which he was convicted."

It is clear that the court in the instant case had jurisdiction to order the examination, since the order was passed after sentence for a crime falling into one of the

specified categories, and before the sentence had been served. The proceeding was initiated by the petition and examination order. Sec. 6(e) provides that "The Court which last sentenced the defendant, whether or not the term of Court in which he was sentenced has expired, shall retain jurisdiction of the defendant for the purpose of any of the procedures specified in Sections 6, 7, 8, or 9 hereof." It would appear that under this sweeping language, jurisdiction, once properly obtained, would continue until the purposes to be served by the examination were accomplished, regardless of the expiration of the original sentence. It is a general rule that a court obtaining jurisdiction of the person and subject matter retains it until the case is finally disposed of. 14 Am. Jur., "Courts", § 170; Hunter v. Warden, 198 Md. 655, 656. In criminal cases the accused, unless released on bail or on his own recognizance, is necessarily held in custody until trial. The remand in the instant case was designed to accomplish the same purpose. Ordinarily credit for time spent in jail pending trial is discretionary with the court and does not go to the question of jurisdiction. Hands v. Warden, 205 Md. 642, 643.

In any event, we think the time of the original sentence did not run during the period the defendant was held for examination. Sec. 7(a) sets out in detail the scope of the examination by three experts, and calls for a determination "On the basis of all the assembled information, plus their own personal examination and study of the said person". Obviously, time is required for study and deliberation. Moreover, the person examined is entitled to an examination, at State expense, by a psychiatrist of his choice. The examiners are required to state their findings in a written report addressed to the court. "If the substance of the report is that the said person is not a defective delinquent, he shall be returned forthwith to the custody of the Department of Correction on the original criminal conviction, and he shall begin or resume his period of confinement on said conviction as if he had not been examined for possible defective delinquency." We

think this is a clear directive that credit shall not be allowed for the time spent in the examination. He could never "begin" serving the original sentence, if credit were given for the examination time. The same language appears in Sec. 9(a), dealing with the situation where a defendant is found not to be a defective delinquent on a trial of the issue before a court or jury.

These provisions denying credit for the time spent in the examination may be contrasted with the provisions of sections 10(a) and 13(e). Where a person confined as a defective delinquent under an indeterminate sentence is subsequently determined by the court or jury not to be a defective delinquent, on a petition for review or on recommendation by the Institutional Board of Review, it is expressly provided that he shall receive credit against his original sentence for the time served in the Institution after the first adjudication.

All of these provisions as to the time spent in the Institution before and after trial of the issue, relate to cases where the defendant is found not to be a defective delinquent. If found to be a defective delinquent, the statute merely provides that he be committed or returned to the Institution for an indeterminate period without either maximum or minimum limits. Sec. 9(b) provides in part: "In such event, the sentence for the original criminal conviction, or any unexpired portion thereof, shall be and remain suspended, and the defendant shall not longer be confined for any portion of said original sentence, except as otherwise provided herein." The exception applies if he is subsequently released, in which event he may be committed under his original sentence, with credit for the time served in the Institution. There is no intimation that he should receive credit for time spent in the Institution prior to confinement under sentence, whether for examination or pending the trial.

The fact that the Legislature has seen fit to allow credit to persons sentenced to the penal institutions under the control of the Department of Correction, for time spent in hospitals or insane asylums, under Code (1951), Art. 27,

secs. 788 and 799, is not controlling. These sections are not applicable here. The new Article deals exclusively with matters of credit for time spent in the Institution, which is neither a prison, a hospital nor an insane asylum, but exercises some of the functions of all three.

The appellant raises a number of constitutional objections to the sentence in the instant case. He contends that since the proceedings authorized by the new law are predicated upon previous conviction for certain specified criminal offenses, the purpose and effect is to put the accused twice in jeopardy for the same offense. It is clear that the prohibition of double jeopardy in the Fifth Amendment of the United States Constitution is not a requisite of due process under the Fourteenth. *Palko v. Connecticut*, 302 U. S. 319. In Maryland the double jeopardy rule is only part of the common law, which may be changed by statute. *State v. Adams*, 196 Md. 341, 344, and cases cited. Moreover, the appellant's argument assumes that the new law is a penal statute imposing a new penalty for an established crime or crimes. We do not so regard it.

Code (1951), Art. 31B, sec. 5, defines a "defective delinquent" as follows: "For the purposes of this Article, a defective delinquent shall be defined as an individual who, by the demonstration of persistent aggravated anti-social or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require confinement and treatment under an indeterminate sentence, subject to being released only if the intellectual deficiency and/or the emotional unbalance is so relieved as to make it reasonably safe for society to terminate the confinement and treatment."

We think the statute is sufficiently certain and definite and sets up matters that are susceptible of proof. The statutory emphasis is on confinement and treatment of these persons rather than on punishment or deterrence. The statute represents the legislative adoption of con-

cepts that have long been recommended by leading psychiatrists and penologists. See *Guttmacher and Weihofen, Psychiatry and the Law,* pp. 444-446. The new Act was the end result of several years of study by a commission authorized by the Legislature and appointed by the Governor, by a special advisory committee appointed by the Board of Correction, and by a committee appointed by the Legislative Council. Moreover, the Legislature appropriated funds for the construction of a new institution to deal with the problem. The new Act calls for a staff composed of professional psychiatrists, psychologists and sociologists. In character the Act is not unlike statutes providing for a civil inquiry into the sanity of a person. This character is not altered by the fact that it deals only with persons who have demonstrated criminal tendencies resulting in criminal convictions, nor by the fact that it utilizes some of the traditional methods of adjudication and review that have been developed in the criminal law. See *State ex rel. Sweezer v. Green,* 232 S. W. 2d 897 (Mo.) ; *Ex parte Keddy,* 233 P. 2d 159 (Cal. App.) ; *People v. Chapman,* 4 N. W. 2d 18 (Mich.) ; *People v. Piasecki,* 52 N. W. 2d 626 (Mich.).

The appellant contends that the statute violates the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. The argument is not based on any lack of procedural due process, indeed the careful safeguards of the Act for the appointment of counsel, furnishing of reports, election of jury trial, and redetermination of the issue at suitable intervals, would seem to preclude such an attack. Cf. *Minnesota ex rel. Pearson v. Probate Court of Ramsey County, et al.,* 309 U. S. 270. Instead, it is contended that the length of confinement is unreasonable. It is argued that there is an unjust discrimination between persons in similar circumstances who may not have been convicted, or have been convicted of crimes the penalty for which is more limited.

It may be noted that Art. 3, sec. 60 of the Maryland Constitution authorizes the enactment of "any form of

the indeterminate sentence in criminal cases". Since we hold that the detention is civil in its nature, this section is not strictly applicable. But it has long been established that a state has the power to restrain the liberty of persons found dangerous to the health and safety of the people. *Salinger v. Superintendent,* 206 Md. 623, 629. See also *People v. Niesman,* 190 N. E. 668 (Ill.) ; *People v. Chanler,* 117 N. Y. S. 322, 325; *Jacobson v. Massachusetts,* 197 U. S. 11; *Buck v. Bell,* 274 U. S. 200. The length of confinement does not extend beyond the reasonable necessity for sequestration. At least twenty states and the District of Columbia have statutes similar to ours, providing for the indefinite confinement of sexual psychopaths. Such statutes have been uniformly upheld. See Note 24 A. L. R. 2d 350. Our statute enlarges somewhat the class of persons considered dangerous to society because of defective delinquency as defined. But the principle is the same. The extent of detention depends primarily in each case upon medical findings as to diagnosis and prognosis, not upon a finding of the elements of a criminal offense. *In re Craft,* 109 A. 2d 853, 855 (N. H.). The detention is not by way of punishment for a crime, but is preventive and therapeutic. We find no violation of the equal protection clause.

On the question of discrimination, we see no reason to doubt that the Legislature could constitutionally make a class of the group of persons it selected, as demonstrably dangerous to society unless cured of their criminal propensities. Whether the Legislature could have gone farther in enlarging the class is beside the point. *Minnesota ex rel. Pearson v. Probate Court of Ramsey County, et al., supra; People v. Sims,* 47 N. E. 2d 703 (Ill.) ; *People v. Chapman, supra.* We think the classification is a reasonable one.

*Appeal from the order of July 22, 1955, dismissed, with costs. Order of September 28, 1955, affirmed, with costs.*