## PALMER *v.* STATE

[No. 50, September Term, 1957.]

*Decided December 19, 1957.*

144

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Joseph G. Finnerty* and *William L. Jacob* for the appellant.

*Joseph S. Kaufman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Frank H. Newell, 3rd, State's Attorney for Baltimore County,* and *Douglas G. Bottom, Assistant State's Attorney,* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal from a judgment of the Circuit Court for Baltimore County rendered by Judge Smith sitting without a jury, on March 22, 1957, that the appellant, James Palmer, was a defective delinquent and ordering that he be committed to Patuxent Institution for an indefinite period, subject to the further order of the Court.

On April 18, 1955, James Palmer was arrested and charged with housebreaking. On April 22, 1955, he pleaded guilty, and Judge Gontrum sentenced him to the State Reformatory for Males for a term not to exceed five years with the recommendation that he be sent to Patuxent Institution for examination to ascertain whether he was a defective delinquent under the provisions of Article 31B, Section 5, of the Maryland Code (1951). This recommendation was carried out and on March 13, 1957, the Director of Patuxent Institution, Dr. Harold M. Boslow, forwarded to the Circuit Court

for Baltimore County a written report and a letter recommending that the appellant be committed to Patuxent Institution on an indeterminate basis as a defective delinquent. In accordance with Article 31B, Section 8, which gives the defendant the right to have the matter tried before a jury and which specifies that he be represented by counsel and have the right to produce witnesses and present evidence, a trial was held before Judge Smith sitting in the Circuit Court for Baltimore County, a jury trial being waived which resulted in the judgment appealed from.

Appellant's appeal is based on the contention that "the State neither by testimony nor evidence has shown that the Appellant comes within the definition of a defective delinquent as defined in Section 5 of Article 31B."

Article 31B, Section 5, reads as follows:

> "For the purposes of this Article, a defective delinquent shall be defined as an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require confinement and treatment under an indeterminate sentence, subject to being released only if the intellectual deficiency and/or the emotional unbalance is so relieved as to make it reasonably safe for society to terminate the confinement and treatment."

It is further provided in Article 31B, Section 9 (b) that if the Court finds the defendant to be a defective delinquent as defined in Section 5, the Court shall order him committed to the institution for an indeterminate period.

The appellant was born in Pennsylvania on December 3, 1933, and moved to the Baltimore area in 1941. He was committed to St. Mary's Industrial School because of truancy in 1945. In 1947 he was paroled and within one month violated his parole by stealing money, and was recommitted to St. Mary's. In 1948, because of repeated escapes, he was

transferred to the Maryland Training School, and released shortly thereafter. In 1949 he broke into a Knights of Columbus Hall and stole money from slot machines, for which he was sentenced to the Maryland Training School where he remained until October, 1950. At this time he was released, but was soon recommitted after he pleaded guilty to six offenses involving breaking into various places at night and stealing money from the premises. In 1954 he was released once again, but by April, 1955, he had again become entangled with the law, this time for stealing automobiles. In connection with this activity he broke into a building to get the keys to one or more cars parked outside on a used car lot. Following his plea of guilty to the charge of housebreaking and his sentence therefor, Judge Gontrum recommended that he be examined in order to determine if he was a defective delinquent who should be committed to Patuxent Institution.

In view of this record appellant does not seriously contend that he does not come within that part of the statutory definition of the defective delinquent which describes "an individual who, by the demonstration of persistent aggravated anti-social or criminal behavior, evidences a propensity toward criminal activity". He does assert, however, that the language immediately following is clearly inapplicable to him and that hence he is not a defective delinquent. The statute continues: "and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society * * *." Both sides concede that appellant does not suffer with an "intellectual deficiency". I. Q. tests indicate that his level of intelligence is average. Therefore, the question narrows down to whether or not the appellant has been shown to have such "emotional unbalance" as is specified in the statute.

What is meant by the phrase "emotional unbalance"? Research Report No. 29, Maryland Legislative Council, submitted in 1950, consisting of an analysis of the proposed new defective delinquent law (the present Article 31B) is helpful in this regard. At page 1 of this Report the author, G. Kenneth Reiblich, states that he was asked to study the need for legislation providing for the confinement and treatment of

certain criminals "who although they would not be insane under the current test of criminal insanity, would be so mentally and/or emotionally deficient as to suggest (and perhaps require) confinement separated from other criminals and treatment for such indefinite period as necessary for a cure." At a subsequent point in this Report (p. 26) there appears a section under the title *"Opinion of Leading Maryland Psychiatrists and Psychologists"*.[1] Here, after discussing the persons who because of an intellectual deficiency coupled with anti-social behavior were a serious danger to society, the other category of dangerous persons was described:

> "The problem is more important and more difficult with those criminals who have deficient emotional balance and control—the so-called psychopaths. These are not merely the habitual offenders, but the individuals who, on the basis of their seriously distorted emotional make-up, persist in carrying out serious depredations against society."

It seems reasonably clear that by the use of the phrase "emotional unbalance" the legislative intent was to refer to those people known medically as psychopaths, or as psychopathic personalities. These persons were described in *Guttmacher and Weihofen, Psychiatry and the Law* (1952) as

> "a group of mentally abnormal individuals who on clinical examination do not fit into the categories of psychoneurosis, psychosis, or intellectual deficiency. These patients are generally without complaints; they do not exhibit abnormally pronounced mood disturbances, nor do they present the distortions of thought which become so manifestly evident in delusions and hallucinations. Furthermore, they are not intellectually retarded. Yet they are constantly in difficulty because of their abnormalities of behavior. They are unable to conform to the

---

1. Dr. Manfred S. Guttmacher, Dr. John C. Whitehorn, Dr. Vernon E. Scheidt, Dr. Jacob E. Finesinger, Dr. Robert M. Lindner and Dr. Clifton T. Perkins were the members of this group.

> standards of their social group, and they are tragic failures in establishing lasting and satisfying interpersonal relationships.  * * *  [The] incapacity to conduct oneself 'with decency and propriety in the business of life' is the outstanding characteristic of the true psychopath."  (p. 86).

See also *Cleckley, The Mask of Sanity,* 1955, on the subject of the psychopathic personality.  Appellant agrees that the language "emotional unbalance" was intended to refer to persons of a psychopathic nature, but he equates the term "psychopathic" with the term "psychotic" and argues that since there is evidence in the record showing that appellant was not psychotic (i. e. one having a psychosis) it must necessarily follow that he was not psychopathic.  "Psychotic" is defined in *Webster's New International Dictionary,* 2d Ed., as "of or pert. to psychosis; caused by or affected by psychosis; insane".

Psychosis is defined as "mental disease; any serious mental derangement;—a purely psychiatric term, without the legal implications of the word insanity.  See insanity".

It will be noted that the description of the psychopath taken from *Psychiatry and the Law, supra,* specifically recognizes the fact that the psychopath does not fit into a psychosis classification.

The record indicates that the appellant is sane and is not psychotic, but the record also amply supports the conclusion that he is afflicted with the very type of psychopathic personality which it seems quite clear the legislature was attempting to reach by the phrase "emotional unbalance" and the language following that term.

We have already held that Article 31B, Section 5, sets up matters that are susceptible of proof.  *Eggleston v. State,* 209 Md. 504, 121 A. 2d 698.  Appellant was examined extensively by various experts in the fields of criminal psychiatry and psychology and their findings are very strong evidence that he is a defective delinquent.

The appellant contends that the expert witnesses who considered his case arrived at the conclusion that he was emo-

tionally unbalanced by stretching his demonstration of persistent, aggravated anti-social behavior to show not only a propensity toward criminal activity, but also to supply the other statutory requisite for a finding of defective delinquency (intellectual deficiency not being present in this case), that the individual have such emotional unbalance as to demonstrate clearly an actual danger to society and to require confinement and treatment. The appellant asserts that such stretching would convert the Defective Delinquent Law into an Habitual Criminal Act. The record, however, contains substantial evidence to show the existence of the emotional unbalance described in the statute, without resort to any such stretching as the appellant complains of, or to reasoning backward from his anti-social conduct.

The evidence includes a staff report dictated by Dr. Edgar James Smith, Associate Director of the Patuxent Institution and a qualified psychiatrist, who had examined Palmer, which report is signed by Dr. Harold N. Boslow, Director of the Institution, and by two members of the staff, Robert B. Taylor, M.D., and Sigmund H. Manne, Criminal Psychologist. There is also a report of a psychological examination made by the latter, and there is testimony by Dr. Smith and testimony by Palmer himself.

In the staff report, under the heading "Personal History", it is stated that Palmer "has been seen numerous times by psychiatrists and psychologists."

This report states that Dr. Esther Richards saw Palmer when he was eleven years old, that she then called him "very psychopathic", and that she saw him again in 1950 and said of him at that time that he was "a psychopathic retarded individual, but there is more psychopath in the picture than there is retardation." She added: "He is a serious social menace and will be a threat to society until he commits a crime of sufficient magnitude such as murder, robbery or a sex crime to put him behind the locked door for a long time."

The staff report also shows that Dr. Samuel Novey saw Palmer in 1945, 1949 and 1950, and that Dr. Novey stated (in part) at various times: "In view of James's [Palmer's] apparent utter incapacity to control his behavior and in view

of the fact that I do not feel that psychiatric treatment would be helpful to him, I would suggest that James be placed in some available institutional setting for as long a period as is possible under the jurisdiction of the court."

There is also a statement in the staff report under the heading "Impression": that Palmer's "emotional instability reveals itself in the form of antisocial activity and he represents a menace to society at present * * *."

Mr. Manne's report of Palmer's psychological examination under the heading "Summary" states in part: "This patient is overtly anxious, and his anxiety is also noted in the test situation. Test results appeared to indicate that he becomes anxious when confronted with the stresses of the external world and its sanctions against sexual misconduct. Apparently he is attempting to defend himself by being rigid, but his impulses appear to be quite close to the surface and his defense of rigidity has been unable to cope with his impulsive demands. He appears to have some difficulty in the sexual area and attempts to keep the world, and his own instinctual demands at bay by setting up a hard rigid form of defense."

Besides these reports, there is Dr. Smith's testimony that he believes Palmer to be a defective delinquent "as defined by law", that he (the Doctor) finds Palmer emotionally unbalanced, that Palmer shows evidence of a severe character disorder, but no evidence of psychosis, and that in Dr. Smith's opinion, "under ordinary circumstances, he [Palmer] has a very rigid control over his emotions, but that under stress, he tends to lose this control."

Palmer's inability to maintain his emotional controls under stress is also recognized by the staff report which states in part, under the heading "Impression": "Present psychiatric evaluation reveals a glib, rationalizer who shirks or ignores any social responsibility and has made his only strong identification with the criminal elements of society. An impoverished capacity for good human relationships is evident both on psychological and psychiatric examinations. The former also shows average intelligence, anxiety and attempted rigid controls which are inadequate to cope with his impulses."

These opinions as to Palmer's inability to maintain under stress the emotional controls which he has sought to place upon himself are in turn supported by Palmer's own testimony. On direct examination he was asked, "Now, what have you got to say about these violations of law, and why do you get involved in them?" His answer was: "Well, I figure I could have stopped it when I was younger if people would have left me alone, if I would have had a fair chance, especially the last two times around 1950 and '54. I was trying to get away to a different neighborhood, especially to get an overseas contract." This was followed a little later on cross-examination by these questions and answers (Mr. Bottom being Assistant State's Attorney):

"(Mr. Bottom) And weren't you impressed any by the penal farm so that you wouldn't go breaking into places?

"(Mr. Palmer) I come out with the idea of not doing it any more. In fact, I didn't want to. I was trying not to. I was trying to make some good friends, and I thought, maybe, well, after being up there for awhile, and everybody forgot about it, that the police that they wouldn't bother me. I was ready to start a good life then, and the police started bothering me right then. I put up with it for as long as I could, until I was down and out, and I had to do something.

"(Mr. Bottom) Are you telling His Honor that you can't keep from breaking into places?

"(Mr. Palmer) No.

"(The Court) What he is saying is you can keep from breaking into places, but the police keep bothering you. If the police wouldn't bother you, you would get along all right.

"(Mr. Palmer) If I was where nobody would bother me, if I am working, making enough money to buy a little bit of clothes and live decent, and nobody pestering me, I am okay, but as soon as they

start pestering me and cause me to lose what I am building up for—

"(The Court) Then you lose your willpower?

"(Mr. Palmer) Yes, sir."

It may be well to note in passing that the statute is very exacting about the professional qualifications and experience required of the top personnel at Patuxent. See Sections 2 and 3. Their expert findings and conclusions are to be accorded very serious consideration, particularly in a case such as this one, when the trial court almost necessarily must rely to a considerable degree on the opinions of expert witnesses.

We think that the evidence before the trial court was sufficient to support its finding that the appellant was a defective delinquent. There was another psychiatric report made at the instance of the appellant but at the expense of the State which the appellant did not offer in evidence. Why he did not do so is not clear. We can only conclude that he thought it of little help. It was offered to us at the argument in this Court, but since it was not in evidence and is not properly before us we have not considered it.

*Judgment affirmed, with costs.*