## COWMAN v. STATE

[No. 263, September Term, 1958.]

*Decided June 8, 1959.*

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott and Horney, JJ.

*Elsbeth Levy* for the appellant.

*James H. Norris, Jr., Special Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, J. Harold Grady, State's Attorney for Baltimore City,* and *Norman Hochberg, Assistant State's Attorney,* on the brief, for the appellee.

Henderson, J., delivered the opinion of the Court.

This appeal is from an order committing the appellant to

Patuxent Institution after a hearing before the court, without a jury, and a finding that the appellant was a defective delinquent under Code (1957), Art. 31B, sec. 9 (b). Although the point is not raised in either brief, it appears from the transcript that the trial court, upon petition and affidavit of the appellant that he was without funds, ordered that the transcript and costs of appeal be supplied by the State, and appointed counsel to represent the appellant on this appeal. We express no opinion on the propriety of this action, since the point was not raised, except to note that Code (1958 supp.), Art. 5, sec. 15A, dealing with appeals in *forma pauperis* in criminal cases, other than death sentence cases, expressly excepts "appeals in accordance with Article 31B." On the other hand the Post Conviction Procedure Act, Code (1958 supp.), Art. 27, sec. 645A, includes proceedings under Art. 31B, but that Act is, of course, not applicable to this appeal. Code (1957), Art. 31B, sec. 11, provides that there shall be the same right of appeal from an order under sec. 9 to the Court of Appeals "as in other civil proceedings." We are not aware of any statutory authority for an appeal in *forma pauperis* in civil cases.

The appellant contends that he is not a defective delinquent as defined in Code (1957), Art. 31B, sec. 5, which defines the term defective delinquent as "an individual who, by the demonstration of persistent aggravated anti-social or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment."

Since the appeal challenges the sufficiency of the evidence to support the court's finding, it is necessary to state the facts in some detail. On January 8, 1958, the appellant was found guilty in the Criminal Court of Baltimore on two indictments charging burglary of his employer's warehouse and safe. The medical officer of the Supreme Bench made an exhaustive examination and report, diagnosing him as a sociopathic personality. He was sentenced on February 7, 1958, to one year on each indictment, to be served concurrently, and ordered to

Patuxent Institution for examination. On October 16, 1958, through counsel appointed by the court under Code (1957), Art. 31B, sec. 8, appellant pleaded not guilty to being a defective delinquent. Dr. Boslow, Director of Patuxent Institution, submitted his report containing the following pertinent information:

The appellant, 48 years of age, has been a heavy drinker for many years. Since 1946, he has repeatedly run afoul of the law. He is described as "basically a cold, hostile person who has only superficial relationships with other people and cares for them only in relation to his ability to exploit them to meet his own needs." He tends to use his excellent intelligence to flout the law. He is described as a dependent, demanding infant who is angry with the world which does not fullfill his demands. His chronic abuse of alcohol not only emphasizes his emotional instability but may have helped blur his concept of and concern for society. He is in the very superior range of intelligence but functions rather poorly in social judgment. A barren self-concept, unconscious aggressiveness and poor interpersonal relationships are other features.

The report further states: "In the opinion of the staff, this man is a predatory, unmoral, emotionally unstable man, who is likely to continue to violate laws. It is recommended that he be committed to this institution as a defective delinquent."

Appellant had been convicted on two previous occasions. In 1946 he was convicted of grand larceny in California, but granted probation after one year in jail, on condition that he make payments on the value of the stolen articles, some $4,000. Probation was revoked because he stopped payments and was drinking heavily, and he spent another eighteen months in jail before being paroled, and parole transferred to Maryland. In July, 1955, he was convicted in Baltimore City of larceny after trust and sentenced to one year in the House of Correction. Medical examinations at that time indicated that he had a defective personality.

At the hearing in the instant case, Dr. Boslow, when asked whether the appellant represented an actual danger to society, replied: "Insofar as he will repeat the same offense he has in the past," which he particularized as "stealing, embezzlement,

victimizing people, that sort of thing." Dr. Boslow also testified he believed the appellant was a defective delinquent on the basis that he will repeat his criminal acts. On cross-examination, Dr. Boslow testified that the appellant could not be helped by private psychiatric treatment because it is necessary that he be institutionalized in order to be "reached" and that he may not repeat the same offenses. Dr. Boslow's prognosis of his recovery was rather "guarded." The appellant testified that he had asked for psychiatric assistance and needed help as "a victim of alcohol."

Dr. Waterman, who examined the appellant at the request of his counsel, testified that the appellant evidenced a propensity toward criminal activities and suffered from an emotional unbalance, characterized by his rigid personality make-up, a degree of emotional immaturity, and by a need over a long period of time to take fairly large amounts of alcohol, to mitigate his anxiety. The witness also testified that if the appellant were released he believed it would culminate in antisocial acts following the previous pattern. Dr. Waterman testified he did not believe the appellant would commit acts of violence, but rather larcenies after trust. Admitting the appellant's high intelligence, he thought he might benefit from institutionalization, perhaps in two years, if he "saw this to his advantage and worked at it."

The appellant has the equivalent of two and one-half years of college credit and had worked as a teller in a bank for eight years, and as a cost accountant for an air line for about eight years. He has recently been married, apparently for the third time. He had a severe seizure, in jail, apparently an aftermath of alcohol or drugs.

Counsel for the appellant in the instant case argues that the legislature intended to exclude from the purview of the Act individuals who, though demonstrating criminal propensities, nevertheless represented no serious danger to society. Pointing out that the phrase "as to clearly demonstrate an actual danger to society" was interpolated by amendment, she contends that the phrase is restrictive, and does not include everything that is criminally harmful. Moreover, she argues that the background and legislative history show that the impetus

and need for the legislation stemmed from concern over crimes of violence, such as murder and rape. We have so recently reviewed the legislative history in *Eggleston v. State*, 209 Md. 504; *McElroy v. Director*, 211 Md. 385; and *Palmer v. State*, 215 Md. 142, that it is unnecessary to repeat it here. In the *Palmer* case it was contended that no rational line can be drawn between a defective delinquent, as defined, and an habitual criminal. It was also contended that only a shadowy line divides an individual suffering from "emotional unbalance," and an individual suffering from a psychosis or mental derangement. We found otherwise. The holding was that there was sufficient evidence to support the finding of defective delinquency, even though the appellant in that case had demonstrated no criminal propensities for crimes against the person, but only a series of larcenies and housebreaking.

In the instant case we think the evidence supports the verdict, and we cannot find that the trial judge was clearly wrong in ordering the commitment. We cannot read the phrase "actual danger to society" as limiting the type or pattern of offenses to crimes against the person. Sec. 6 of the Act limits the possibility of commitment to persons convicted of crimes in certain categories, but these are not limited to crimes against the person. It may well be that there are some crimes, or series of crimes, so trivial as to pose no actual danger to society. Repeated incarcerations for being drunk and disorderly, for example, might threaten no actual danger to the person or property of others, but rather to the individual himself. But where it is shown that the alcoholism is a symptom of emotional unbalance, and that the propensity towards antisocial and criminal conduct stems from the latter condition, we think the Act is applicable, even though no threat of violence is posed.

Counsel for the appellant also contends that the expert testimony as to "emotional unbalance," involves a legal conclusion, based merely upon antecedent behavior. Here again, we recognize that it is difficult to draw the line between a so-called "normal" criminal, and a "psychopathic" or "emotionally unbalanced" criminal. But as we have said, the matter is one susceptible of proof, and courts must rely largely upon the

opinions of the experts, particularly where there is no substantial disagreement in the basic diagnoses. Antecedent behavior is only one of the tests. It is claimed that examination and observation by competent and experienced pyschiatrists and psychologists, together with established tests of an objective nature, can separate these offenders from the rest of the criminal group. We are not prepared to hold that the claim is unfounded, or that such tests play an inconclusive role. Nor are we prepared to deny the validity of the claim, merely on the strength of the assertion that such a large proportion of all criminals could be shown to be "emotionally unbalanced" that Patuxent could not possibly deal with them all. The present Act is admittedly a new approach to an old and puzzling problem. We should not impose legal impediments to proper legislative experiments that meet constitutional requirements.

*Order affirmed, with costs.*