John SAS, Appellant,

v.

STATE OF MARYLAND, Director of Patuxent Institution, Appellees.

Albert Delanor MUREL, Appellant,

v.

STATE OF MARYLAND and Director of Patuxent Institution, Appellees.

James C. SHINE, Appellant,

v.

STATE OF MARYLAND, Director of Patuxent Institution and the Maryland State Legislature, Appellees.

Timothy Patrick O'CONNOR, Appellant,

v.

STATE OF MARYLAND Director, Patuxent Institution, Appellees.

George L. CRESWELL, Appellant,

v.

DIRECTOR, PATUXENT INSTITUTION, Appellee.

Nos. 9094, 9095, 9096, 9098, 9143.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 6, 1963.

Decided June 16, 1964.

508

Brodnax Cameron, Jr., Bel Air, Md., and John D. Alexander, Jr., Baltimore, Md. (court-assigned counsel), for appellants.

Gerard Wm. Wittstadt, Asst. Atty. Gen. (Thomas B. Finan, Atty. Gen., and Jacques E. Leeds, Asst. Atty. Gen., on brief), for appellees.

Before BOREMAN and J. SPENCER BELL, Circuit Judges, and CRAVEN, District Judge.

J. SPENCER BELL, Circuit Judge.

This is a consolidated appeal of five petitions for writs of habeas corpus filed by five inmates of Maryland's Patuxent Institution wherein they seek to have the Maryland Defective Delinquent Act, Ann.Code of Md., Article 31B (Supp. 1961) [hereinafter the Act], under which they are confined declared unconstitutional. The petitions were denied by the district court without the issuance of a writ of habeas corpus or show cause order, without requiring the state to file returns, without appointment of counsel for the indigent petitioners and without argument or hearing.[1]

The petitioners allege facts which raise serious questions of a non-frivolous nature which concern the constitutionality of the Act. We hold that statute to be facially constitutional; i. e., it is within the power of the state to segregate from among its lawbreakers a class or category which is dangerous to the public safety and to confine this group for the purpose of treatment or for the purpose of protecting the public from further depredations. We remand the case in order that the district court may appoint counsel, issue a show cause order to the State of Maryland, and permit the filing of an answer to the petition.

Thereafter, the district court will accord to each petitioner whatever type hearing may be appropriate in accordance with the standards promulgated in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and will then determine whether the statute is being constitutionally applied. In addition to any points which counsel may raise, the court should consider and determine whether the statutory definition of a defective delinquent as applied by the Maryland courts is sufficiently definitive to permit its practical application within constitutional limitatons; whether the procedures embodied in the statute are applied in such a manner as to afford due process to the accused within the confrontation requirements of the sixth amendment; whether the proposed objectives of the Act are sufficiently implemented in its actual administration to support its categorization as a civil procedure and justify the elimination of conventional criminal procedural safeguards, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); whether the interpretation and application of the statutory requirement that a defective delinquent be found to be "an actual danger to society" may within the eighth amendment's prohibition against cruel and unusual punishment include those whose conduct indicates no more than a danger to property rights as distinguished from violence to the person; whether Patuxent does in fact furnish treatment for treatable defective delinquents as distinguished from other lawbreakers which would support the Act under the equal protection clause of the fourteenth amendment. Only when these and any other questions raised by the petitioners at the hearing are answered can the requirements of Fay v. Noia, 372.

---

1. The district court has upheld the constitutionality of the Act in a number of brief memorandum opinions which refer to the opinions of the Maryland Court of Appeals without any attempt independently to analyze the many serious questions of federal constitutional law involved. Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

The Maryland court has considered the constitutionality of the Act in more than thirty cases in which all aspects of the issue have been discussed. See especially Blizzard v. State, 218 Md. 384, 147 A.2d 227 (1958); Eggleston v. State, 209 Md. 504, 121 A.2d 698 (1956), and other cases cited herein.

U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745 (1963), be satisfied.

The Defective Delinquent Act of Maryland is the end result of a series of studies made in Maryland between 1948 and 1950. In 1947 the Legislature authorized and directed the Governor to appoint a commission consisting of doctors, judges, psychiatrists, psychologists and lawyers to study the problems of medico-legal psychiatry raised by recidivism. On December 28, 1948, the commission completed its work and submitted a report.[2]

Meanwhile, the Maryland Board of Correction had appointed a special advisory committee of seven eminent psychologists and psychiatrists to study the same general problem, and this committee rendered its report in January 1949. Ultimately, the two groups made a joint recommendation that a new institution should be set up for "criminal mental and emotional defectives", such institution to include a unit to function as a diagnostic clinic. It further recommended an indeterminate sentence law for criminal defectives to fulfill the purposes of the new institution. Thereafter, the Legislative Council of Maryland appointed a Committee on Medico-Legal Procedure, charged with the responsibility of making a study of the joint recommendations of the commission and the committee, and of drafting the proposed legislation. In 1951, the bill prepared by this committee was passed by the Legislature with a few minor amendments as the Defective Delinquent Act of Maryland and codified as Article 31B of the Annotated Code of Maryland (1951).

The first four sections of the Act provide for the establishment of the Patux-

ent Institution, the composition of its staff and its general administrative organization. It requires that the Director be a psychiatrist of at least five years experience in practice or teaching. Two of the Associate Directors must be psychiatrists with at least three years experience. An operating staff of psychiatrists, social workers, psychologists and sociologists is provided to operate the diagnostic clinic and to provide the treatment for the inmates of Patuxent.

Section five, the heart of the Act, defines the term defective delinquent as follows:

### "Defective Delinquents
"§ 5. Defined.

"For the purposes of this article, a defective delinquent shall be defined as an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment."

The remainder of the Act provides, in essence, that persons convicted of specified offenses may be thereafter tried as defective delinquents and if found to be such may be confined for an indeterminate period.

Section 6(a) lists the offenses conviction of which will subject one to trial for being a defective delinquent. It includes: (1) felonies; (2) serious misdemeanors; (3) crimes of violence; (4)

2. The history and objectives of the statute are to be found in Research Report No. 29, Research Division of the Legislative Council of Maryland (December 1959). See also: Report of the Commission to Study and Re-Evaluate Patuxent Institution, Legislative Council of the General Assembly of Maryland (January 25, 1961); Report of the Commission to Study Medico-Legal Psychiatry submitted to Governor William Preston Lane, Jr., and the Maryland General Assembly, December 28, 1948; Address on Defective Delinquency, Honorable Jerome Robinson, House of Delegates of Maryland, Delivered to the General Assembly of the Council of State Governments, December 5, 1958.

certain sex crimes; and (5) two or more convictions for any offenses or crimes punishable by imprisonment in a Maryland criminal court. These classifications include both felons and rogues, vagabonds and other offenders against property. See, e. g., Reed v. Warden, 212 Md. 645, 129 A.2d 92 (1957) (rogue and vagabond). See generally Brumbaugh, *A New Criminal Code for Maryland?*, 23 Md.L.Rev. 1 (1963).

A convict may be examined for possible defective delinquency upon the request of the Department of Correction, the prosecuting State's Attorney in the criminal case, the convict or his attorney, or the convicting criminal court, "on any knowledge or suspicion of the presence of defective delinquency." Act, Section 6(b). This request may only be made if the convict has been sentenced to or is then serving a criminal sentence in a state penal institution. Act, Section 6(c). The request is filed with the convicting criminal court, which thereafter retains jurisdiction over the defendant. Act, Sections 6(d), (e).

After the examination is ordered, the convict suspected of defective delinquency is transferred to Patuxent Institution and examined by a medical physician, a psychiatrist and a psychologist, who on the basis of their examination and study of the suspected defective delinquent and the circumstances of the originating crime, copies of any probation or other reports about him, and reports as to his social, physical, mental and psychiatric condition and history determine whether the suspected person is or is not a defective delinquent. Act, Section 7(a).

If the institutional report states that the suspected person is a defective delinquent, he is brought before the criminal court which sentenced him and is entitled to counsel of his choice and a jury trial. The right to speedy trial under the sixth amendment and Article 21 of the Maryland Declaration of Rights does not apply. McCloskey v. Director, 230 Md. 635, 187 A.2d 833 (1963). At the defective delinquency determination hearing, the state has the burden to establish, by a preponderance of the evidence, and not beyond a reasonable doubt, that the criminal is a defective delinquent. Purks v. Director, 226 Md. 43, 171 A.2d 726 (1961); Blizzard v. State, 218 Md. 384, 147 A.2d 227 (1958). If a jury is prayed, the jury is judge of the fact only and not of law and fact, as in criminal cases under the Maryland Constitution, Article 15, Section 5. Blizzard v. State, supra. The defendant may not argue law to the jury, as in criminal cases. Purks v. Director, supra.

The state's evidence at the hearing is essentially that of expert witnesses, whose "expert findings and conclusions are to be accorded very serious consideration, particularly in a case such as this one, when the trial court almost necessarily must rely to a considerable degree on the opinions of expert witnesses." Palmer v. State, 215 Md. 142, 152, 137 A.2d 119, 125 (1957). See Purks v. State, 226 Md. 43, 171 A.2d 726 (1961). The institutional experts who testify for the state are not in a patient-physician relationship with the criminal and may testify as to matters learned from the criminal in interviews and tests, even if the same concerns prior criminal offenses and convictions and admissions of prior antisocial conduct. Simmons v. Director, 227 Md. 661, 177 A.2d 409 (1962); McDonough v. Director, 229 Md. 626, 183 A.2d 368 (1962); Purks v. State, supra. Extensive hearsay regarding the past social, physical, mental and psychiatric and criminal condition and history is admitted at the hearing over objection, since it is deemed that the Act requires the introduction of the same and that the purpose of the law would be defeated unless evidence of antecedent conduct is presented upon which to establish the propensity toward criminal activity. Simmons v. Director, supra; Fairbanks v. Director, 226 Md. 661, 173 A.2d 913 (1961).

The psychiatrist of the criminal's own choice, which must be furnished him by the state upon request, is not in the position of a medical expert in

an adversary proceeding. He is considered to be "independent." He is required to submit a written report of his examination and findings to the court for consideration by the trier of fact. The defendant has no control over the admission of the report of this independent psychiatrist and the physician-patient relationship does not apply. Simmons v. Director, supra.

Defendant's counsel has access to the records and reports of Patuxent (and of the "independent" psychiatrist) which, presumably, he can put into evidence just as can the state. Act, Section 8. The defendant also has discovery procedures available to him pursuant to the Maryland Rules of Civil Procedure. Purks v. State, 226 Md. 43, 171 A.2d 726 (1961).

At a determination hearing the sole issue is "whether the person is a defective delinquent as defined in § 5." Act, Section 8(c). The trier of fact is precluded from considering whether treatment will aid defendant and whether any is available. Purks v. State, 226 Md. 43, 50, 171 A.2d 726 (1961); Queen v. Director, 226 Md. 664, 174 A.2d 351 (1961).

If the defendant is found not to be a defective delinquent, he is returned to the custody of the Department of Correction under his original criminal sentence, with credit for time spent in Patuxent and credit for behavior at Patuxent pursuant to the provisions of the state criminal code. Act, Section 9(a); Ann.Code of Md., Article 27, Section 688 (Supp. 1962).

If the defendant is found to be a defective delinquent, the court is required to commit him to the Patuxent Institution, "for an indeterminate period without either maximum or minimum limits" and the sentence for the originating crime is suspended. Act, Section 9(b). The defective delinquent convict can be incarcerated at Patuxent Institution after his originating criminal sentence has expired, the purpose of his confinement being not to punish, but to receive "such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment." Act, Section 5. If he should escape this confinement, even if his originating criminal sentence has expired, he is guilty of the crime of escape under the provisions of the criminal code, Ann.Code of Md., Article 27, Section 139 (Supp.1963). See McCloskey v. Director, 230 Md. 635, 187 A.2d 833 (1963); Caparella v. State, 214 Md. 355, 135 A.2d 311 (1957).

During incarceration at Patuxent, the Institutional Board of Review may request the original criminal court to reinstate and reimpose the original criminal sentence upon the defective delinquent, who is then thereafter imprisoned in a penal institution, though he is still a defective delinquent. Act, Section 13(d).

Any person in the custody of the Patuxent Institution may be transferred by administrative decision, without a hearing, to the Department of Correction for imprisonment. Act, Section 16(d). This administrative transfer to a penal institution for imprisonment may take place regardless of whether the originating criminal sentence has expired. A convict sentenced to a determinate criminal sentence could, after defective delinquency determination, spend the rest of his life in the penitentiary.

During Patuxent confinement, the defective delinquent is subject to the term of his suspended original criminal sentence, and if released prior to its expiration, may be required to serve the remainder of that sentence. Act, Sections 10(a), 13(f).

While it is clear that a Patuxent inmate is subject to immediate and actual physical confinement without maximum or minimum limits, there is no requirement that he be given treatment unless the same is "appropriate." Act, Section 5. See Purks v. State, 226 Md. 43, 171 A.2d 726 (1961).

The Institutional Board of Review is required to review and re-examine each defective delinquent annually, utilizing

examination procedures used in the first determination, and make a recommendation for the future status and treatment of each inmate so reviewed. Act, Section 13(b).

After a defective delinquent has been confined for two-thirds of his original criminal sentence or for a period of two years, whichever is longer, he may file a petition for redetermination of his defective delinquency. Act, Section 10(a). If the inmate is found not to be a defective delinquent, the court may discharge him from confinement or commit him under his original criminal sentence with credit for time spent at Patuxent and credit for behavior at Patuxent pursuant to the provisions of the criminal code. Act, Section 10(a); Ann.Code of Md., Article 27, Section 688 (Supp.1962). If the inmate is found to be a defective delinquent, excepting his application for leave to appeal, he is denied further petitions for review until intervals of not less than three years have elapsed. Act, Section 10(b).

▆▆▆ The Act expressly saves the writ of habeas corpus to the defective delinquent, the Act, Section 10(c), who also has a post conviction remedy pursuant to the criminal code, Ann.Code of Md., Article 27, § 645A (Supp.1959). In neither proceeding can the defective delinquent raise the question of his defective delinquency on the merits. See Brown v. Director, 224 Md. 635, 165 A.2d 895 (1960), cert. denied, 365 U.S. 859, 81 S.Ct. 830, 5 L.Ed.2d 825 (1961).

The State's brief explains the objectives of the Act: "The Maryland Defective Delinquency Act is expressly designed to apply to that borderline group of individuals who, though found to be legally sane, are mental or emotional defectives, or both. Under the Act, these individuals adjudged defective delinquents, would be incarcerated not for the purpose of punishment or deterrence, but for treatment and for the protection of society during the period that they were undergoing such treatment."

It is obvious, however, from the statistics to date, that the justification for the Act may not rest solely or even primarily, on the theory that all defective delinquents will receive treatment or that the majority of the inmates who do will be greatly benefitted or cured by treatment. Certainly this is true for the foreseeable future unless unanticipated increases in staff and break throughs in the science of psychiatry make great changes in the amount and efficacy of diagnosis and treatment possible. Many of the inmates will, therefore, in all likelihood, be confined for life on the premise that they are untreatable or incurable but, nevertheless, too dangerous either to life or to property to be released in a free society.[3]

The petitioners attack the Act on several constitutional grounds. First it is contended that the definition of the defective delinquent as set forth in the statute is too vague both as to the class of persons who fall within the Act and the applicable tests to ascertain guilt to constitute valid legislation.

▆▆▆ We cannot agree that the statutory definition upon its face is unconstitutional. The subject matter of the statute—the health, welfare and safety of the people of Maryland—is within the area of the police power of the legislature. This being true, only if the Act has not real or substantial relation to that objective—or is palpably and patently an invasion of the individual's constitutional rights—may the courts strike down the Act. Jacobson v. Massachu-

---

3. Report of Commission to Study and Re-evaluate Patuxent Institution, Legislative Council of the General Assembly of Maryland (January 25, 1961). See the report of The Committee of the American Psychiatric Association on Patuxent Institution appended to the commission report at page 49 wherein the committee said:

"From the standpoint of social policy, the Defective Delinquent Law is primarily concerned with the protection of society, secondarily with the rehabilitation of antisocial persons by means now developed by psychiatry, psychology and the social sciences."

setts, 197 U.S. 11, 31, 25 S.Ct. 358, 49 L.Ed. 643 (1905). In Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940), the appellant had filed a writ of prohibition to prevent the probate judge from trying him as a "Psychopathic Personality" under the Minnesota Act.[4] The Minnesota Appellate Court had defined the Act to apply to persons who by an habitual course of misconduct showed an utter lack of power to control their sexual impulses and hence were likely to attack others or otherwise inflict injury. In upholding the statute, as construed by the state court, Chief Justice Hughes held that there was a rational basis for the class selected by the legislature; that the definition was not so vague or indefinite as to constitute invalid legislation and, therefore, the Act was constitutional upon its face. While psychiatrists no longer approve the term psychopath as a definitive medical term, we note that the definition adopted by the Minnesota Appellate Court and approved by the Supreme Court was not dependent upon the medical acceptability of the term psychopath. It is obvious that the Maryland statutory definition was carefully drawn to conform to the definition approved by the Court in the Minnesota case.

The Maryland Court of Appeals, however, has construed the statutory definition to include mentally deficient persons and/or psychopaths who by persistent aggravated anti-social or criminal behavior have clearly demonstrated themselves to be such an actual danger to society as to require confinement. Palmer v. State, 215 Md. 142, 137 A.2d 119, 122 (1957). Whether or not the court's interpretation of the words "emotionally unbalanced" as used in the statutory definition to include "psychopaths"—a term which is not determinable by medical standards alone—has rendered the definition too vague to be constitutionally acceptable is a matter which may not be determined without the aid of expert testimony not available on this record. Counsel for the petitioners offer the expert writings of members of the Patuxent staff to show that "emotional unbalance" is such a quantitatively and qualitatively inaccurate term that any person who seeks to apply the definition is forced to depend upon an individual interpretation of the evidence of past antisocial and criminal conduct. Again it is the district court which must provide a record which will offer a solution to this issue.

We must also reject the petitioners' contention that the Act upon its face violates the equal protection clause of the fourteenth amendment. The preoccupation of society with the problems of recidivism and rehabilitation, which show no signs of solution by conventional penological methods, strongly support the efforts of Maryland to seek a new approach. The problem furnishes a rational basis for the legislature's efforts to set apart a group of convicted felons—who were "demonstrably dangerous to society unless cured of their criminal propensities." Eggleston v. State, 209 Md. 104, 121 A.2d 698 (1956). In Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523 (1940), the Court answered this contention as follows:

"The question, however, is whether the legislature could constitutionally make a class of the group it did select. That is, whether there is any rational basis for such a selection. We see no reason for doubt upon this point. Whether the legislature could have gone farther is not the question. The class it did select is identified by the state court in terms which clearly show that the persons within the class constitute a dangerous element in the community which the legislature in its discretion could put under appropriate control. As we have often said, the legislature

---

4. The District of Columbia and approximately 20 states have similar statutes. But see: Ch. 10, *The Sexual Psychopath*

*and the Law*, The Mentally Disabled And The Law (Lindman and McIntyre ed. 1961) for criticism of many of these Acts.

is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be the clearest. If the law 'presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.'" 270 U.S. at 274–75, 60 S.Ct. at 526.

See also Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927), where Mr. Justice Holmes writing, the Court upheld the constitutionality of the Virginia Sterilization Law. In rejecting the equal protection argument he said:

"But the answer is that the law does all that is needed when it does all that it can, indicates a policy, applies it to all within the lines, and seeks to bring within the lines all similarly situated so far and so fast as its means allow." 274 U.S. at 208, 47 S.Ct. at 585.

The petitioners also contend that the Act does not provide them with a fair trial in that it denies them procedural due process. An examination of the trial and hearing provisions of the Act can leave no doubt that it places around the accused more procedural safeguards than any of the Acts of a similar nature which have been upheld by the courts against this attack. Not until the convicted felon has been examined and diagnosed by the Patuxent Clinic is he liable to trial under the statute as a defective delinquent. He is entitled to a jury trial with special finding. He must be allowed counsel of his own choice or furnished counsel. He has the power to summon witnesses. He is entitled to be furnished a psychiatrist who is independent of Patuxent. While the sentence prescribed for the defective delinquent is fixed by the law as an indeterminate sentence, it nevertheless requires yearly administrative review of his record by the Patuxent staff and an opportunity to the petitioner at fixed times to have a judicial review of his status. The procedural protection here furnished exceeds that provided in either the Minne-

sota Psychopathic Personality Statute, or the Virginia Sterilization Act, both of which were upheld by the Supreme Court. In the Minnesota case the Court pointed out that the statute provided for notice and hearing, the right to counsel and to witnesses, and impartial experts to assist in the examination and appeal. There too, the penalty was indeterminate confinement but the Court felt that the right to petition for release was adequate procedural protection for this provision of the Act.

But petitioners attack the trial provided in the Maryland Act on the ground that it departs from the common law rules of evidence in permitting the experts to testify over objection to hearsay matters either admitted by the petitioner during his clinical examination at Patuxent or collected by the staff from the petitioner's school records or indeed from any source deemed of relevance by the psychiatrist in forming his opinion. They also question the fairness of permitting the experts to express their opinion on the ultimate issue before the jury; i. e., whether the petitioner is a defective delinquent within the meaning of the statute. The petitioners also complain that the statute provides that the state must carry its case only by the greater weight of the evidence. The answer to all of these objections is that with respect to state action repeated decisions of the Supreme Court have put it beyond the range of further debate that the "due process" clause of the fourteenth amendment has not the effect of imposing upon the states any particular form or mode of procedure, so long as the essential rights of notice and a hearing, or opportunity to be heard, before a competent tribunal are not interfered with. Frank v. Mangum, 237 U.S. 309, 340, 35 S.Ct. 582, 59 L.Ed. 969 (1915). Thus the Supreme Court has ruled that trial by jury may, by a state, be modified or abolished altogether; so also compulsory incrimination, Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), and double jeopardy, Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149,

82 L.Ed. 288 (1937). Care, however, should be taken to read these cases in the light of the Court's more recent decisions beginning with Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), in which the Court has broadened the concept of liberty contained in the fourteenth amendment and thus has brought to bear on the states the constitutional requirement of fundamental fairness contained in many sections of the Bill of Rights not theretofore thought to apply to them. See Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and at pages 345–47, 83 S.Ct. at pages 797–98, where Mr. Justice Douglas in a concurring opinion reviews the history of this process. See also Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) and Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

 It would, therefore, appear that the Act upon its face provides adequate procedural safeguards; indeed it throws around the accused many safeguards not ordinarily found in so-called civil proceedings. By examining the records of the actual trials of the petitioners, the district court can determine whether in application these safeguards result in basic fairness of procedure imposed upon the state by the fourteenth amendment. We are not here speaking only of the "perfection of the machinery for correction" which may be referred to as procedural due process. Fay v. Noia, 372 U.S. 391, 421, 83 S.Ct. 822, 839 (1963); Cf. Moore v. Dempsey, 261 U.S. 86, 90–91, 43 S.Ct. 265, 67 L.Ed. 543 (1923).[5]

Finally, we again caution that we are here concerned only with the constitutionality of the Maryland statute upon its face. We are fully aware of the dangers inherent in the application of this new and radical approach in the present state of medico-legal knowledge of the problems of crime and recidivism. In its essence, the statute rejects the age old concept that every legally sane person possesses in equal degree the free will to choose between doing right and doing wrong. Instead, it substitutes the concept that there is a category of legally sane persons who by reason of mental or emotional deficiencies "evidence a propensity toward criminal activity," which they are incapable of controlling.[6] For those in the category who are treatable it would substitute psychiatric treatment for punishment in the conventional sense and would free them from confinement, not when they have "paid their debt to society," but when they have been sufficiently cured to make it reasonably safe to release them. With this humanitarian and progressive approach to the problem no person who has deplored the inadequacies of conventional penological practices can complain. But a statute though "fair on its face and impartial in appearance" may be fraught with the possibility of abuse in that if not administered in the spirit in which it is conceived it can become a mere device for warehousing the obnoxious and antisocial elements of society.[7] Many of the inmates in Patuxent are there by reason of offenses against property rights. Many jurists and laymen would seriously question the wisdom of the practice of indefinitely confining young men under these circumstances. De-

---

5. Insofar as the basic constitutional rights of the parties to due process are concerned, the arguments as to whether the Act is civil or penal in nature are futile exercises in semantics. An Act which deprives sane men of their liberty by confining them under severe discipline with or without treatment requires a basic fairness of procedure and substance—"implicit in the concept of ordered liberty"—to comport with the guaranties of our National Constitution. By these standards, the Supreme Court reviewed the Minnesota statute which concededly is as civil in nature as the Maryland statute.

6. GLUECK, LAW AND PSYCHIATRY (1962).

7. The 1961 Report of the Commission to Study and Re-Evaluate Patuxent Institution raises many of the problems which must be frequently reviewed while sufficient experience accumulates to make a final judgment.

ficiencies in staff, facilities, and finances would undermine the efficacy of the Institution and the justification for the law, and ultimately the constitutionality of its application.

The petitions should be reconsidered by the district court and since they are pro se petitions they should be construed liberally. Darr v. Burford, 339 U.S. 200, 203–04, 70 S.Ct. 587, 94 L.Ed. 761 (1950).

The creation of a non-medically determinable category of persons who may be confined for indeterminate periods by a civil proceeding is so serious a departure from traditional concepts of justice that it deserves a critical analysis on the broadest of terms after a careful factual development of its present operation. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745 (1963).

Remanded.