MUREL ET AL. *v.* BALTIMORE CITY CRIMINAL COURT ET AL.

No. 70–5276.   Argued March 28–29, 1972—Decided June 19, 1972

*Karl G. Feissner* and *Andrew E. Greenwald* argued the cause for petitioners.   With them on the brief were *William L. Kaplan* and *Thomas P. Smith.*

*Henry R. Lord,* Deputy Attorney General of Maryland, argued the cause for respondents.   With him on the brief were *Francis B. Burch,* Attorney General, and *Edward F. Borgerding* and *Donald R. Stutman,* Assistant Attorneys General.

*Evelle J. Younger,* Attorney General, *Herbert L. Ashby,* Chief Assistant Attorney General, *William E. James,* Assistant Attorney General, and *Russell Iungerich* and *William R. Pounders,* Deputy Attorneys General, filed a brief for the State of California as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Alan F. Charles* for the National Legal Program on Health Problems of the Poor, and by *Curtis R. Reitz* and *Julian Tepper* for the Prison Research Council of the University of Pennsylvania Law School.

PER CURIAM.

Petitioners were convicted of various state crimes and sentenced to fixed terms of imprisonment. They were then committed to the Patuxent Institution in lieu of sentence, for an indeterminate period, pursuant to the Maryland Defective Delinquency Law, Md. Ann. Code, Art. 31B. They sought federal habeas corpus, challenging on constitutional grounds the criteria and procedures that led to their commitment, and the conditions of their confinement. They contend, *inter alia*, that the statutory standard for commitment is impermissibly vague, that they are entitled to put the government to the burden of proof beyond a reasonable doubt, that at the compulsory psychiatric examination prescribed by the statute they were entitled to have the assistance of counsel and to invoke the privilege against self-incrimination, and that they are being denied a constitutional right to treatment. The District Court denied relief *sub nom. Sas* v. *Maryland,* 295 F. Supp. 389 (Md. 1969), and the Court of Appeals affirmed *sub nom. Tippett* v. *Maryland,* 436 F. 2d 1153 (CA4 1971).[1] We granted certiorari, 404 U. S. 999

---

[1] Petitioner Murel was originally committed as a defective delinquent in 1962, and Creswell in 1958; their separate petitions for federal habeas corpus were denied without hearing in 1963. On appeal, the Court of Appeals consolidated these and other similar cases, and remanded all of them for a hearing, *sub nom. Sas* v. *Maryland,* 334 F. 2d 506 (CA4 1964). The hearing was deferred, by agreement of the parties, pending the outcome of related litigation in the state courts, which culminated in the decision in *Director* v. *Daniels,* 243 Md. 16, 221 A. 2d 397, cert. denied *sub nom. Avey* v. *Boslow,* 385

(1971), to consider whether, and to what extent, the constitutional guarantees invoked by petitioners apply to this kind of commitment process. After briefing and oral argument, it now appears that this case does not present these issues in a manner that warrants the exercise of the certiorari jurisdiction of this Court.

1. Of the four petitioners, one has been unconditionally released from confinement, and the other three are subject to criminal sentences that have not yet expired, and that would bar their release from custody even if their claims were to prevail.[2] This fact, while not necessarily dispositive of all the claims presented by these petitioners, casts those claims in a different light, not contemplated by our original grant of the writ.[3] Cf. *McNeil* v. *Director, Patuxent Institution, ante,* p. 245.

2. Under our decisions in *Baxstrom* v. *Herold,* 383 U. S. 107 (1966), *Humphrey* v. *Cady,* 405 U. S. 504 (1972), and *Jackson* v. *Indiana,* 406 U. S. 715 (1972), petitioners' challenge to the Maryland Defective Delinquency Law should be considered in relation to the

---

U. S. 940 (1966). The federal habeas hearing was then held in the consolidated cases, which by this time also included that of petitioners Hayes and Avey, who had been committed after the Court of Appeals' remand order. The petitions were again denied, 295 F. Supp. 389 (Md. 1969), and the Court of Appeals affirmed, 436 F. 2d 1153 (CA4 1971).

[2] At the start of this litigation nine years ago both Murel and Creswell were subject to confinement that was wholly attributable to the Defective Delinquency Law, their sentences having expired. This is no longer the case because Murel was recently released, and Creswell was convicted and sentenced on new charges. We therefore do not reach their claims.

[3] We do not suggest that these claims are moot, or that a case or controversy is lacking, or that habeas corpus is inappropriate to test the special incidents, if any, of these defective-delinquency confinements. See *Carafas* v. *LaVallee,* 391 U. S. 234 (1968); *Jones* v. *Cunningham,* 371 U. S. 236 (1963); *North Carolina* v. *Rice,* 404 U. S. 244, 248 (1971).

criteria, procedures, and treatment that the State of Maryland makes available to other persons, not "defective delinquents," committed for compulsory psychiatric treatment. We are informed that the statutes governing civil commitment in Maryland are presently undergoing substantial revision, designed to provide greater substantive and procedural safeguards to committed persons. Accordingly, it seems a particularly inopportune time for this Court to consider a comprehensive challenge to the Defective Delinquency Law.

In these circumstances, the writ of certiorari is therefore dismissed as improvidently granted.

*It is so ordered.*

MR. JUSTICE DOUGLAS, dissenting.

Patuxent Institution is a special prison used by the State of Maryland for the incarceration of "defective delinquents." Individuals who have demonstrated "persistent aggravated anti-social or criminal behavior," who have "a propensity toward criminal activity," and who have "either such intellectual deficiency or emotional unbalance" as to present "an actual danger to society" may be confined at Patuxent. Md. Ann. Code, Art 31B, § 5 (1971). The initial determination that one is a defective delinquent is made judicially and, for those confined to Patuxent after such a determination, there is the right to seek judicial redetermination of their status at three-year intervals. *Id.*, § 6 *et seq.* One of the objectives of Patuxent supposedly is to provide treatment for the inmates so that they may be returned to society. *Director v. Daniels,* 243 Md. 16, 31–32, 221 A. 2d 397, 406 (1966). Should a defective delinquent not receive treatment, or should the treatment prove inadequate to return him to society, the inmate might

well remain in Patuxent for the remainder of his life. See *McNeil* v. *Director, Patuxent Institution, ante,* p. 245.

Petitioners brought this action in the District Court challenging various aspects of their confinement at Patuxent. The District Court denied relief, *Sas* v. *Maryland,* 295 F. Supp. 389 (Md. 1969); the Court of Appeals affirmed, *Tippett* v. *Maryland,* 436 F. 2d 1153 (CA4 1971); and we granted the petition for a writ of certiorari. 404 U. S. 999. Because I base my decision on narrow grounds, I do not reach the broader issues tendered by petitioners.

When a State moves to deprive an individual of his liberty, to incarcerate him indefinitely, or to place him behind bars for what may be the rest of his life, the Federal Constitution requires that it meet a more rigorous burden of proof than that employed by Maryland to commit defective delinquents. The Defective Delinquency Law does not specify the burden of proof necessary to commit an individual to Patuxent, but the Maryland Court of Appeals has determined that the State need only prove its case by the "fair preponderance of the evidence." *E. g., Crews* v. *Director,* 245 Md. 174, 225 A. 2d 436 (1967); *Termin* v. *Director,* 243 Md. 689, 221 A. 2d 658 (1966); *Dickerson* v. *Director,* 235 Md. 668, 202 A. 2d 765 (1964); *Purks* v. *State,* 226 Md. 43, 171 A. 2d 726 (1961); *Blizzard* v. *State,* 218 Md. 384, 147 A. 2d 227 (1958); and see *Sas* v. *Maryland,* 334 F. 2d 506 (CA4 1964); *Walker* v. *Director,* 6 Md. App. 206, 250 A. 2d 900 (1969). Petitioners have thus been taken from their families and deprived of their constitutionally protected liberty under the same standard of proof applicable to run-of-the-mill automobile negligence actions.[1]

---

[1] In petitioner Murel's redetermination hearing on December 21, 1964, for example, the trial court instructed the jury: "The burden is on the State to prove by a preponderance of evidence, as I have

The Court of Appeals disapproved this standard but, because it felt it insignificant, nonetheless held it to be consistent with the requirements of the Due Process Clause:

> "We might all be happier had [the burden of persuasion] been stated in terms of clear and convincing proof rather than in terms of a preponderance of the evidence. However meaningful the distinction may be to us as judges, however, it is greatly to be doubted that a jury's verdict would ever be influenced by the choice of one standard or the other. We all know that juries apply the preponderance standard quite flexibly, depending upon the nature of the case. In any event, in the present state of our knowledge, choice of the standard

stated to you, that the defendant does come within all phases of the definition of a defective delinquent." Trial Transcript. 70.

The jury instructions in petitioner Creswell's December 20, 1961, redetermination trial were similar:

"The burden of proof in this particular case is governed by our normal civil rules of evidence. The burden of proof is on the State to satisfy you that this defendant is a defective delinquent. If the State has not satisfied you by a fair preponderance of the evidence that he is a defective delinquent, or if your minds are in a state of equal balance, or even balance, after considering all the evidence as to whether he is or is not a defective delinquent, then it is your duty to find him to be not a defective delinquent.

"However, if you are satisfied by a fair preponderance of the evidence that he is a defective delinquent, then it is your duty to so find him to be such defective delinquent." Trial Transcript 75–76.

The record developed in the District Court also included the jury instructions in the October 30, 1959, redetermination hearing of Charles Tippett, who was a petitioner in the District Court:

"The Court informs you that having once been determined to be a defective delinquent and now that he comes before you and asks to be released as cured of whatever defect there was, the burden is on him to convince you by a fair preponderance of the testimony that that is so." Trial Transcript 40.

of proof should be left to the state. A legislative [*sic*] choice of the preponderance standard, the same standard governing civil commitments of mentally ill persons who have no history of criminality, ought not to be held in violation of due process requirements when we have no firm foundation for an evaluation of the practical effects of the choice." *Tippett* v. *Maryland, supra,* at 1158–1159.

Judge Soboloff dissented in part and would have held the State to a more stringent burden:

"The reasonable doubt standard is indispensable in both criminal and juvenile proceedings . . . for 'it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' . . .

"The objections to the preponderance standard apply with equal force in defective delinquency hearings—indeed they are even more compelling in the latter class of cases, since indefinite incarceration is at stake. Due process commands that the jury must be satisfied beyond a reasonable doubt as to all objective facts in dispute, including the truth of any alleged incidents relied upon by the psychiatrists in reaching their recommendation." *Id.,* at 1165 (citations omitted).

In considering the constitutionally mandated burdens of proof applicable to particular types of cases, our decisions have attached greater significance to the varying standards than did the Court of Appeals below. In *Speiser* v. *Randall,* 357 U. S. 513, 520–521 (1958), we said:

"To experienced lawyers it is commonplace that the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how the factfinder appraises the facts than on a disputed

.construction of a statute or interpretation of a line of precedents. Thus the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important must be the procedural safeguards surrounding those rights."

And see *In re Winship*, 397 U. S. 358, 368 (1970) (Harlan, J., concurring).

The reason for our continued concern over the applicable burden of proof is that a lawsuit—like any other factfinding process—is necessarily susceptible of error in the making of factual determinations. The nature of the rights implicated in the lawsuit thus determines the allocation and degree of the burden of proof and consequently the party upon whom the risk of errors in the factfinding process will be placed. We applied this reasoning in *Speiser,* where First Amendment rights were implicated:

"In all kinds of litigation it is plain that where the burden of proof lies may be decisive of the outcome. There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt." 357 U. S., at 525–526 (citations omitted).

In *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971), MR. JUSTICE BRENNAN, in an opinion joined by THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN, again applied these principles and reasoned that the important First Amendment interests present in defamation actions required plaintiffs to meet an extraordinary burden of proof. JUSTICE BRENNAN said, "In libel cases . . . an erroneous verdict for the plaintiff [is] most serious. . . . [T]he possibility of such error . . . would create a strong impetus toward self-censorship which the First Amendment cannot tolerate." *Id.*, at 50. MR. JUSTICE BRENNAN thus concluded that a more rigorous burden of proof was necessary to safeguard the important First Amendment rights involved:

> "We . . . hold that a libel action . . . by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 52.

*In re Winship, supra,* dealt with an individual's personal liberty which we had characterized as "an interest of transcending value" in *Speiser,* 357 U. S., at 525. There, we determined that "proof beyond a reasonable doubt" was constitutionally required "because of the possibility that [an individual might] lose his liberty" and because of the stigma of a criminal conviction. 397 U. S., at 363. And see *Woodby* v. *Immigration and Naturalization Service,* 385 U. S. 276, 285 (1966).

In the present case, petitioners were deprived of their most basic right—their personal liberty—under a burden of proof which was constitutionally inadequate. The

right to liberty is one of transcendent value. Without it, other constitutionally protected rights such as the right of free expression and the right of privacy become largely meaningless. Yet Maryland has deprived petitioners of this right, using a burden of proof which fails to give sufficient weight to the interests involved.

It is no answer to say that petitioners' commitments were in "civil" proceedings and that the requirement for proof beyond a reasonable doubt is required only in "criminal" cases. *In re Gault,* 387 U. S. 1 (1967), and *In re Winship, supra,* specifically rejected this distinction and looked instead at the interests involved and the actual nature of the proceedings. See also *Baxstrom* v. *Herold,* 383 U. S. 107 (1966); *Specht* v. *Patterson,* 386 U. S. 605 (1967). Nor would it be persuasive to argue that the difficulty in proving one's state of mind requires that the State be afforded the benefit of a lesser burden of proof. Proving a state of mind is no more difficult than many other issues with which courts and juries grapple each day.[2] An individual who is confronted with

---

[2] Bruce J. Ennis, Staff Attorney of the New York Civil Liberties Union and Director of the Civil Liberties and Mental Illness Project, testified as follows before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 91st Cong., 1st & 2d Sess., 277–278 (1969 and 1970):

"As I mentioned earlier, the mentally ill are possibly less dangerous than the mentally healthy. A five and a half year study of 5,000 patients discharged from New York State mental hospitals showed that 'patients with no record of prior arrest have a strikingly low rate of arrest after release. . . . Their over-all rate of arrest is less than $\frac{1}{12}$ that of the general population and the rate for each separate offense is also far lower, especially for more serious charges.' Another psychiatrist states that there is 'not a shred of evidence that the mentally ill are any more dangerous than the mentally healthy.' A diagnosis of mental illness tells us nothing about whether the person so diagnosed is or is not dangerous. Some mental patients are dangerous, some are not. Perhaps the psychiatrist is an expert at deciding whether a person is mentally ill, but is he an expert at predicting

the possibility of commitment, moreover, runs the risk of losing his most important right—his liberty.

*Speiser* and *Winship* indicate that an individual's personal liberty is an interest of transcending value for the deprivation of which the State must prove its case beyond a reasonable doubt. I would follow established precedent and hold that a State may not subject individuals to lengthy—if not indefinite—incarceration under a lesser burden of proof. Accordingly, I would reverse the judgment below.

---

which of the persons so diagnosed are dangerous? Sane people, too, are dangerous, and it may legitimately be inquired whether there is anything in the education, training or experience of psychiatrists which renders them particularly adept at predicting dangerous behavior. Predictions of dangerous behavior, no matter who makes them, are incredibly inaccurate, and there is a growing consensus that psychiatrists are not uniquely qualified to predict dangerous behavior and are, in fact, less accurate in their predictions than other professionals.

"Because predictions of dangerous behavior are so grossly unreliable, we should authorize confinement only if the predicted danger is proved 'beyond a reasonable doubt' rather than by a mere preponderance of the evidence." (Footnotes omitted.)