STATE OF NEW JERSEY IN THE INTEREST OF M. S.

Juvenile and Domestic Relations Court of Essex County
May 10, 1974.

Addendum to Opinion May 31, 1974.

62

*Mr. Robert J. Schenkman,* Assistant Prosecutor, for the State (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney; *Ms. Sara A. Friedman,* Assistant Prosecutor, on the brief).

*Mr. Thomas S. Smith,* Assistant Deputy Public Defender, for the juvenile (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Michael Degnan,* Assistant Deputy Public Defender, on the brief).

*Mr. Robert A. Rubenfeld,* Deputy Attorney General, for *amicus curiae* (*Mr. William F. Hyland,* Attorney General, attorney; *Mr. Rubenfeld* on the brief).

MATTURRI, J. J. & D. R. C. The question presented in this case is whether the unauthorized departure of a juvenile in need of supervision from the Essex County Shelter (hereinafter referred to as the Shelter) where she was placed by court order pending permanent placement constitutes escape. The issue is one of first impression in this State. In order to understand how this complex issue arose, a brief recitation of the juvenile's background is necessary.

The case involves M. S., a 13-year-old girl with an extensive history of runaways from various juvenile facilities. The initial complaint filed against her (J–6530–72) alleged that she absconded from the Shelter on four separate occasions. She was charged with being an habitual runaway, a ground for adjudication of delinquency under *N. J. S. A.* 2A:4–14 (1959), the old Juvenile Court statute then in effect.[1] Since she failed to appear in court on the scheduled

---

[1] *N. J. S. A.* 2A:4–14 (1959) (hereinafter referred to as the old Juvenile Court statute) provides as follows:

Except as stated in section 2A:4–15 of this Title, the juvenile and domestic relations court shall have exclusive jurisdiction to hear and determine all cases of juvenile delinquency.

date, a bench warrant for her appearance was issued. Upon her return she was placed in a foster home.

On September 5, 1973 a second delinquency petition (J–84–73) charged M.S. with running away from her foster home and incorrigibility, pursuant to *N. J. S. A.* 2A:4–14 (1)(f) (1959). After the detention hearing she .was remanded to the Youth House. Only two days later, on September 8, 1973, she again fled. Later that day she was returned by her mother. Due to her unstable home situation, M.S. was presumably unwilling to even remain with her. She could give no reason justifying her absence; she had no

Juvenile delinquency is hereby defined as the commission by a child under 18 years of age

(1) of any act which when committed by a person of the age of 18 years or over would constitute:

a. A felony, high misdemeanor, misdemeanor, or other offense, or

b. The violation of any penal law or municipal ordinance, or

c. Any act or offense for which he could be prosecuted in the method partaking of the nature of a criminal action or proceeding, or

d. Being a disorderly person, or

(2) of the following acts:

e. Habitual vagrancy, or

f. Incorrigibility, or

g. Immorality, or

h. Knowingly associating with thieves or vicious or immoral persons, or

i. Growing up in idleness or delinquency, or

j. Knowingly visiting gambling places, or patronizing other places or establishments, his admission to which constitutes a violation of law, or

k. Idly roaming the streets at night, or

l. Habitual truancy from school, or

m. Deportment endangering the morals, health or general welfare of said child.

But the commission of any act which constitutes a violation of the provisions of chapters 3 or 4 of Title 39, Motor Vehicles, of the Revised Statutes, or of any amendment or supplement thereof, by any child who is the holder of a valid license to operate a motor vehicle under the laws of this or any other State, shall not constitute juvenile delinquency as defined in this section. [As amended L. 1959, c. 73, p. 188, § 1]

The statute was supplanted by *N. J. S. A.* 2A:4–42 to 67 (1973) (hereinafter referred to as the new Juvenile Court statute) which became effective on March 1, 1974.

complaints about her treatment at the institution. As a result of this incident a third complaint was issued (J–178–73) charging her with escape.

Upon her own admission M.S. was adjudicated delinquent for being a runaway and incorrigible (J–84–73) on October 1, 1973. The two remaining complaints for being an habitual runaway (J–6530–72) and escape (J–178–73) were dismissed upon the prosecutor's motion. The Division of Youth and Family Services was ordered to investigate placement possibilities and report its findings to the court. Thereupon, she was placed in a foster home. Meanwhile, arrangements were made to have appropriate psychological, psychiatric and physical examinations performed. Due to extreme behavioral problems, however, she was removed to the Shelter on October 12, 1973. On October 27, 1973 she once more left the Shelter, thereby interrupting the testing process. After her return on November 28, 1973 she was again remanded to the Youth House. She was transferred by court order to the Shelter on March 1, 1974, the effective date of the new Juvenile Court statute, awaiting permanent residential placement to be reported by the Division.[2]

Within five days, on March 6, 1974, M.S. staged another exodus from this temporary abode. After a nine-day absence, she was remanded to the Youth House, where she has been detained due to her numerous prior runaways. In light of her chronic background she was charged with juvenile delinquency

---

[2]Although M. S. was adjudicated delinquent for runaway and incorrigibility under the old statute (*N. J. S. A.* 2A:4–14(1)(f) (1959)) which did not distinguish juveniles in need of supervision (hereinafter referred to as JINS) from delinquency, under the new statute (*N. J. S. A.* 2A:4–42 to 67 §§ 3, 4 (1973)) the same complaint would only suffice for a JINS adjudication.

In retroactive application of the new statute, juveniles who were previously detained at the Youth House under charges which would only support JINS petitions within the present statute, were transported to the Shelter. Consequently, M. S. is being treated as a JINS for purposes of the new statute, despite her delinquency adjudication under the old statute.

for escape in violation of *N. J. S. A.* 2A:104–6 (1934) under the complaint in issue (S–33). This latest flight allegedly comprised her eighth runaway (six from the Shelter) over an eight-month period, all occurring while she was still 12 years old.

The child's psychological and psychiatric testing indicated a good deal of "street savvy," as demonstrated by her frequent successful runaway incidents. In her psychological interview she readily confessed to smoking pot, "snorting" and drinking, as well as stabbing others and attempting suicide. She was diagnosed as a "hysterical personality with passive-aggressive features." Her behavior was classified as unmanageable, disruptive and oppositional. A distinct likelihood of "sexual acting out" during her runaway escapades was noted. This is supported by her admission of casual sexual relationships with five boys since age 9, and her preoccupation with having a baby of her own. Closely supervised, structured residential placement was strongly recommended by the examining psychologists, the social worker, as well as the caseworker from the Division of Youth and Family Services.

The facts in this case are not in issue. As stated in defendant's brief, "the juvenile left the grounds of the Shelter." The only question to be resolved is whether her actions constitute escape within *N. J. S. A.* 2A:104–6 (1934).

It is argued that as a JINS, M.S. may not be placed in a physically confining environment. The contention is made that running away from a nonrestrictive facility, such as the Shelter, cannot be penalized as escape under *N. J. S. A.* 2A:104–6 (1934) since such a charge would contravene the philosophy of the new Juvenile Act.

*N. J. S. A.* 2A:104–6 (1934) defines escape thusly:

*Any person* imprisoned or detained in a place of confinement, or *being in the lawful custody or control* of a penal or correctional institution or *of an officer or other person,* upon any charge, indictment, conviction or sentence for any crime, *or upon any writ or process in a civil action or proceeding,* or to await extradition, who by force or fraud escapes or attempts to escape from such place of

confinement or from such custody or control, or leaves the building or grounds of his place of confinement without the consent of the officer in charge, is guilty of a misdemeanor. (Emphasis added)

As originally enacted in 1898, this statute only prohibited escape from incarceration. *State v. Frost,* 95 *N. J. Super.* 1 (App. Div. 1967). The 1931 amendment extended its coverage to include escape from the custody or control of the sheriff or any other officer. The present version, enacted in 1934, further broadened its scope to criminalize escape by one detained via civil "writ or process." *State v. Frost, supra.* Though entitled by the headnotes as "Prisoners escaping or attempting to escape," it is clear that the provision also encompasses flight by non-prisoners from "lawful custody or control" in civil proceedings. It is well established that headnotes are not part of the *Revised Statutes* and "no implication or presumption of a legislative construction is to be drawn therefrom." *In re J. W.,* 44 *N. J. Super.* 216, 224 (App. Div. 1957), certif. den. 24 *N. J.* 465 (1957).

Various analogous statutes also proscribe unauthorized departures from situations not involving strictly criminal incarceration. Unsanctioned absence by a judicially committed patient from a mental institution has been characterized as escape. *N. J. S. A.* 30:7B–5 (1956); *N. J. S. A.* 30:4–116 (1924). *See State v. LeVien,* 82 *N. J. Super.* 29 (Law Div. 1963), in which the court intimated that any attempt to leave the institution by a judicially committed mental patient would be met by force. See also, *Drew v. Thaw,* 235 *U. S.* 432, 35 S. Ct. 137, 59 L. Ed. 302 (1914); *Slagle v. State,* 243 *Md.* 435, 221 *A.* 2d 641 (Ct. App. 1966); *cf. Frazier v. United States,* 119 U. S. App. D. C. 246, 339 *F.* 2d 745 (D. C. Cir. 1964); *Zimmer v. State,* 247 *N. E.* 2d 195 (Ind. Sup. Ct. 1969); *contra, State v. Burris,* 346 *S. W.* 2d 61 (Mo. Sup. Ct. 1961). For cases finding defendant guilty of escape upon absconding from a hospital to which he was transferred from prison, see *United States v. Perez,* 457 *F.* 2d 555 (6 Cir. 1972); *Tucker v. United States,* 251 *F.*

2d 794 (9 Cir. 1958); *State v. Adams,* 4 *Ariz. App.* 298, 419 *P.* 2d 739 (Ct. App. 1966); *People v. Armstrong,* 188 *Cal. App.* 2d 745, 10 *Cal. Rptr.* 618 (D. Ct. App. 1961); *Best v. Warden,* 235 *Md.* 633, 201 *A.* 2d 490 (Ct. App. 1964); *contra, Goodman v. State,* 96 *Ariz.* 139, 393 *P.* 2d 148 (Sup. Ct. 1964).

Willful failure to remain within the limits of confinement or to promptly return to an assigned facility has also been designated as escape. *N. J. S. A.* 30:4–91.5 (1969). *See Johnsey v. State,* 80 *Okl. Cr.* 84, 157 *P.* 2d 221 (Ct. App. 1945); *Perry v. State,* 80 *Okl. Cr.* 58, 157 *P.* 2d 217 (Ct. App. 1945). See also *United States v. Rudinsky,* 439 *F.* 2d 1074 (6 Cir. 1971); *United States v. Coggins,* 398 *F.* 2d 668 (4 Cir. 1968); *McCullough v. United States,* 369 *F.* 2d 548 (8 Cir. 1966); *Nace v. United States,* 334 *F.* 2d 235 (8 Cir. 1964); *People v. Labrum,* 25 *Cal. App.* 3d 105, 101 *Cal. Rptr.* 602 (D. Ct. App. 1972); *People v. Perez,* 24 *Cal. App.* 3d 340, 100 *Cal. Rptr.* 834 (D. Ct. App. 1972); *contra, United States v. Person,* 223 *F. Supp.* 982 (S. D. Cal. 1963).

Absconding from a workhouse, *N. J. S. A.* 30:8–36 (1877), or from a work release program, *N. J. S. A.* 30:8–53 (1968), are also punishable as escape. See *People v. Smith,* 195 *Cal. App.* 2d 789, 16 *Cal. Rptr.* 111 (D. Ct. App. 1961); *People v. Hadley,* 88 *Cal. App.* 2d 734, 199 *P.* 2d 382 (D. Ct. App. 1948); *Saylor v. Commonwealth,* 122 *Ky.* 776, 93 *S. W.* 48 (Ct. App. 1906); *State v. Putnam,* 248 *Minn.* 182, 79 *N. W.* 2d 273 (Sup. Ct. 1956); *State v. Baker,* 355 *Mo.* 1048, 199 *S. W.* 2d 393 (Sup. Ct. 1947); *State v. McInerney,* 53 *R. I.* 203, 165 *A.* 433 (Sup. Ct. 1933). See also *United States v. Hollen,* 393 *F.* 2d 479 (4 Cir. 1968); *People v. Haskins,* 177 *Cal. App.* 2d 84, 2 *Cal. Rptr.* 34 (D. Ct. App. 1960); *Gaskill v. State,* 1 Storey 107, 51 *Del.* 107, 138 *A.* 2d 500 (Super. Ct. 1958); *State v. Rardon,* 221 *Ind.* 154, 46 *N. E.* 2d 605 (Sup. Ct. 1943); *Cutter v. Buchanan,* 286 *S. W.* 2d 902 (Ky. Ct. App. 1956); *Shifflett v. State,* 4 *Md. App.* 227, 242 *A.* 2d 182 (Ct. App. 1968); *State ex rel.*

*Johnson v. Warden,* 196 *Md.* 672, 75 *A.* 2d 843 (Ct. App. 1950); *Sweden v. State,* 83 *Okl. Cr.* 1, 172 *P.* 2d 432 (Ct. App. 1946); *contra, Utley v. State,* 281 *N. E.* 2d 888 (Ind. Sup. Ct. 1972). See also, *N. J. S. A.* 2A:104–10 (1907) prohibiting aiding an escape from a state home or institution for girls or from any employment where a girl is placed by the managers of the home or institution.

A perusal of the above statutes and cases indicates that absence without official permission is an evil to be avoided not merely because of the threat of violence, but also because the judicially sanctioned control is frustrated thereby. The focus is not only on the actual restraint on one's freedom, but also on the effect that flight will have on the exercise of judicial authority. See *State v. Frost, supra,* 95 *N. J.* at 5–6; *State v. Hayes,* 52 *N. J. Super.* 178, 187 (App. Div. 1958).

This rationale is equally applicable to the civil writ or process language of *N. J. S. A.* 2A:104–6 (1934). Although the statute does not define the nature of the custody or control that need be. extended over the individual, the Legislature must have surely intended to inhibit those under official control by noncriminal judicial orders.

In construing allegedly ambiguous sections of any statute, a reasonable interpretation should be made based on the legislative purpose as revealed by the composite thrust of the whole statutory scheme and in the light of its legislative history. [*State v. Frost, supra,* 95 *N. J.* at 3–4]

A JINS sent to the Shelter by court order may be correctly described as "in the lawful custody or control * * * of an officer or other person * * * upon any writ or process in a civil action or proceeding" within *N. J. S. A.* 2A:104–6 (1934). A juvenile action involving JINS may be properly characterized as civil in nature. By segregating JINS from delinquency proceedings under the new statute, the Legisla-

ture manifested its intent to distinguish JINS from even the *quasi*-criminal aspects of delinquency.[3]

Although "shelter care" is defined by § 2(d) of the new statute as "temporary care of juveniles in facilities without physical restriction pending court disposition," as opposed to "detention," which involves physical restriction, it is clear that even the former necessarily impinges on the juvenile's freedom of mobility. As a residence facility, the Shelter is theoretically operated on an "open-door" basis, in that its inhabitants are not confined by bars or locks. The juveniles therein are not subject to the restraints of a correctional institution. Yet, they are under the constant supervision of houseparents and are assigned to particular groups which

---

[3]The new Juvenile Act defines delinquency as follows:

3. Definition of delinquency.

As used in this act, "delinquency" means the commission of an act by a juvenile which if committed by an adult would constitute:

a. A homicide or act of treason;

b. A high misdemeanor or misdemeanor;

c. A disorderly persons offense; or

d. A violation of any other penal statute, ordinance or regulation.

In contrast, JINS are characterized thusly:

4. Definition of "juvenile in need of supervision".

As used in this act, "juvenile in need of supervision" means:

a. A juvenile who is habitually disobedient to his parent or guardian;

b. A juvenile who is ungovernable or incorrigible;

c. A juvenile who is habitually and voluntarily truant from school; or

d. A juvenile who has committed an offense or violation of a statute or ordinance applicable only to juveniles.

Evidence of conduct which is ungovernable or incorrigible may include but shall not be limited to:

(1) habitual vagrancy,

(2) immorality,

(3) knowingly visiting gambling places, or patronizing other places or establishments, the juvenile's admission to which constitutes a violation of law,

(4) habitual idle roaming of the streets at night,

(5) deportment which endangers the juvenile's own morals, health or general welfare. [*N. J. S. A.* 2A:4-42 to 67, §§ 3-4 (1973)]

they may not leave. They must continually report their whereabouts and are forbidden to depart without permission. As such, JINS judicially placed at the Shelter are in custody or control for purposes of escape therefrom. "(S)ome restraint upon \* \* \* complete freedom" suffices as custody within the meaning of the statutory proscription. *United States v. Rudinsky, supra,* 439 F. 2d at 1076.

This construction is confirmed by the authority granted by the new statute to take a juvenile "into custody if the law enforcement officer has reasonable cause to believe that [he] is in need of supervision." *N. J. S. A.* 2A:4–42 to 67, § 13, subd. b (1973). It would be incongruous to empower an officer to detain a potential JINS under this provision, and yet view her judicial placement at the Shelter as anything but "lawful custody or control."

Various other jurisdictions have similarly interpreted "custody or control" within the context of escape. Failure to return to a Federal Community Treatment Center which defendant was allowed to leave during the day has been found to comprise escape. *United States v. Rudinsky, supra.* The same conclusion was reached regarding a State Reception and Diagnostic Center, *State v. Gordon,* 203 *Kan.* 69, 453 *P.* 2d 80 (Sup. Ct. 1969), as well as a Pre-Release Guidance Center (a halfway house), *McCullough v. United States, supra; Nace v. United States, supra; contra, United States v. Person, supra.* Flight from a Defective Delinquent Institution treatment center has also been held to be an escape, despite the basically civil nature of the commitment procedure. *Sas v. Maryland,* 334 *F.* 2d 506 (4 Cir. 1964), on remand, 295 *F. Supp.* 389 (D. Md. 1969), aff'd 436 *F.* 2d 1153 (4 Cir. 1971) *cert.* dism. *sub nom. Murel v. Baltimore City Criminal Court,* 407 *U. S.* 355, 92 S. Ct. 2091, 32 L. Ed. 2d 791 (1972); *Caparella v. State,* 214 *Md.* 355, 135 *A.* 2d 311 (Ct. App. 1957); *People ex rel. Dickie v. Nenna,* 51 *Misc.* 2d 343, 273 *N. Y. S.* 2d 253 (Sup. Ct. 1966).

Based on a New York statute closely resembling *N. J. S. A.* 2A:104–6 (1934),[4] absence without license from a narcotics rehabilitation center upon commitment by court order, is also deemed escape. *People v. Bifulco,* 64 *Misc.* 2d 10, 313 *N. Y. S.* 2d 889 (Sup. Ct. 1969). Even flight from a drug treatment center upon *voluntary* commitment, effectuated by court order, may be criminalized as escape. *State v. Nenna,* 57 *Misc.* 2d 229, 291 *N. Y. S.* 2d 749 (Sup. Ct. 1968); *cf. People v. Malloy,* 58 *Misc.* 2d 538, 296 *N. Y. S.* 2d 259 (Crim. Ct. 1968), a decision by a lower level court of limited jurisdiction that was rejected by *People v. Bifulco, supra.* See also, *People v. Labrum, supra,* and *People v. Perez, supra,* involving escapes from narcotics treatment detention facilities. In *Bifulco,* since the addict was placed at the treatment facility by court order, it seemed clear to the court that "his alleged departure * * * falls squarely within the Penal Law's definition of escape * * *." *People .v. Bifulco, supra,* 313 N. Y. S. 2d at 891. The court was persuaded by the underlying policy consideration of deterring such escapes.

Addicts would continually attempt to escape * * *. If they are caught they lose relatively little, and if they are not, their illegal end is accomplished. A facility would spend more time concerning itself with these constant attempts than in curing its patients. Successful rehabilitation is difficult, and this sort of atmosphere would make it practically impossible.

\* \* \* \* \* \* \* \*

Constant escapes are no cure for addiction * * * and the interests of neither society nor the addict are served by running these centers on a revolving door basis. [*Id.* at 891–892]

This rationale is readily applicable to the instant case. A JINS is clearly in need of some type of treatment within the ambit of the Juvenile Court. M.S.'s sojourn in the

---

[4]The New York Penal Law proscribes escape where one is detained "pursuant to an order of a court." *N. Y. Penal Law* § 205.00 (1)(d) (McKinney's Consol. Laws, c. 40, 1965).

Shelter was intended to effectuate this goal, as its objective was to perform the psychological examinations that were critical to the determination of her permanent placement. Her multitudinous absences clearly frustrated this purpose.

██ Under the above approach it is therefore established that M.S.'s retention in the Shelter by court order fulfilled the statutory requirements of "custody or control * * * upon any writ or process in a civil proceeding" under *N. J. S. A.* 2A:104–6 (1934), and her flight therefrom comprised escape. It must now be resolved whether a JINS can be charged with delinquency for her unsanctioned absence from the Shelter.

██ Clearly, under the new statute a juvenile may be charged with delinquency upon the commission of any act that would constitute an adult criminal offense. *N. J. S. A.* 2A:4–42 to 67, § 3 (1973). The proscription against escape under *N. J. S. A.* 2A:104–6 (1934) applies equally to juveniles as well as adults. *State v. Hayes, supra,* held this provision specifically applicable to juveniles, even involving an escape from illegal detention. See also, *Hamner v. State,* 223 *A.* 2d 532 (Me. Sup. Ct. 1966). This is not a novel interpretation. See *United States v. Kinsman,* 195 *F. Supp.* 271 (S. D. Cal. 1961); *Baker v. State,* 205 *Md.* 42, 106 *A.* 2d 692 (Ct. App. 1954); *People v. Goslar,* 19 A. D. 2d 912, 244 *N. Y. S.* 2d 37 (App. Div. 1963); *People v. Chesley,* 282 *App. Div.* 821, 123 *N. Y. S.* 2d 42 (App. Div. 1953); *contra, United States v. Sprouse,* 145 *F. Supp.* 292 (N. D. Fla. 1956).

██ Since a juvenile previously adjudicated delinquent may be liable for escape upon violation of *N. J. S. A.* 2A:104–6 (1934), one treated as a JINS should be similarly chargeable. The juvenile's prior record should not be the determinative factor in resolving *future* complaints. Despite its mandate of segregating JINS from delinquents, nowhere does the new Act prohibit subsequent delinquency petitions against one previously adjudicated delinquent, but treated

as a JINS, upon violation of a criminal statute. Otherwise,
a JINS could never later be charged with delinquent be-
havior. Surely, such an incongruous result was not intended
by the legislature.

Consequently, if the statutory elements of *N. J.
S. A.* 2A:104-6 (1934) are met, an adjudication of delin-
quency for escape from the Shelter by a JINS would not
contradict the legislative policies expressed in the new statute.
A contrary conclusion would, in effect, divest the court of the
necessary flexibility to effectuate the rehabilitation of ju-
veniles and would negate judicial power to enforce orders
regarding their placement. There undoubtedly comes a
time when the juvenile can no longer be treated as a JINS.
Upon the commission of what would comprise an adult crim-
inal offense, the juvenile may be charged with delinquency
if the JINS approach proves fruitless. The court is required
by the new statute to act in a manner that would best further
the rehabilitation of the juvenile. *N. J. S. A.* 2A:4-42 to
67, § 1(b) (1973). Inherent in its jurisdiction is the power
to proceed via a JINS action, even though a delinquency
petition may be proper. Yet, when delinquency in the form of
a criminal statutory violation is alleged, the court need not
pursue the JINS approach. It may utilize a delinquency route,
where otherwise statutorily supported, in order to employ the
more stringent dispositional avenues only thereby available un-
der § 20(h) of the new statute.[5] The juvenile has no vested

---

520. Disposition of delinquency cases.

If a juvenile is adjudged delinquent the juvenile and domestic rela-
tions court may order any of the following dispositions:

\* \* \*

(h) Commit the juvenile to a suitable institution maintained for
for the rehabilitation of delinquents for an indeterminate term not
to exceed 3 years; except, that, any time an adjudication of juvenile
delinquency is predicated upon an offense which, if committed by a
person of the age of 18 years or over would constitute any form of
homicide as defined in N. J. S. A. 2A:113-1, 2A:113-2, 2A:113-4
or 2A:113-5 then the period of confinement shall be indeterminate
and shall continue until the appropriate paroling authority deter-

right to insist on being treated as a JINS, when the complaint would support a delinquency adjudication resulting from a statutory violation.

Indeed, *Vann v. Scott,* 467 *F.* 2d 1235 (7 Cir. 1972), addressed itself to this very issue. In that case juveniles were adjudged in need of supervision as runaways from their families or foster homes. Upon their violation of a court order not to further engage in such activity, they were charged with delinquency.[6]

The court held that inclusion of runaways in the same statutory category as more blameworthy delinquents was not constitutionally infirm.

[W]e cannot say that there is no rational basis for the General Assembly's definition of delinquency. The broad classification [of runaways as delinquents] serves the legislative purpose of lessening the stigma that attaches to the youth who has committed a serious offense but is nevertheless an eligible candidate for complete rehabilitation. If the classification were to be narrowed, the stigma associated with the finding would increase.

The purpose of the classification is not primarily to label or to conceal the character of a child's misconduct. It is to afford the State an adequate opportunity to rehabilitate and safeguard delinquent minors rather than to punish them. Tragic though the plight of the chronic runaway may be, we cannot say that it is irrational to conclude that the same kind of correctional treatment may be appropriate for him as for another youth who has already engaged in more serious antisocial conduct. [*Id.* at 1239]

mines that such person should be paroled; and, except that in any case the period of confinement and parole shall not exceed the maximum provided by law for such offense if committed by a person of the age of 18 years or over.

Any juvenile committed under this act who is released on parole prior to the expiration of his maximum term may be retained under parole supervision for a period not exceeding the unserved portion of the term. [*N. J. S. A.* 2A:4-42 to 67, § 20(h) (1973)]

All of the dispositional remedies except institutionalization are available in JINS actions. *N. J. S. A.* 2A:4-42 to 67, § 21(a) (1973).

---

[6]Violation of a lawful court order was a ground for a delinquency adjudication under the Illinois Juvenile Court Act. See *Ill. Rev. Stat. c.* 37, § 702-2(b).

The *Vann* court concluded that institutional commitment of a chronic runaway upon a delinquency finding would not violate the Eighth Amendment's prohibition against cruel and unusual punishment.

As the Illinois Supreme Court has held, in some circumstances the State's interest in safeguarding the lives and welfare of minors, or possibly its interest in seeking to deter repetition of undesirable though not criminal conduct, may justify the temporary incarceration of a chronic runaway. [*Vann v. Scott, supra* at 1241]

 Similarly, in the case at bar, a JINS may be adjudicated delinquent and institutionalized for escaping from the Shelter. Any other approach would hamstring the court in its efforts to resolve a chronic runaway problem. Clearly, after flight, the escapee should be removed to a place of greater security. See *State v. Baker, supra.*

The court therefore holds that a JINS may be charged with and found delinquent for escaping from the Shelter where she was placed by court order.

# ADDENDUM TO OPINION

On May 31, 1974, a dispositional hearing was held regarding M.S. The Court has determined that the Division of Youth and Family Services is to effectuate her placement. She is remanded to the Youth House pending permanent placement.