(No. 60184.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. TERRY B. ALLEN, Appellee.

*Opinion filed July 17, 1985.*

Neil F. Hartigan, Attorney General, of Springfield, and John A. Barra, State's Attorney, of Peoria (Jill Wine-Banks, Solicitor General, and Mark L. Rotert and Sally L. Dilgart, Assistant Attorneys General, of Chicago, and John X. Breslin and Terry A. Mertel, of the State's Attorney's Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Peter A. Carusona, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa (Jean Herigodt, of Elk Grove Village, of counsel), for appellee.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Terry B. Allen, was charged by information in the circuit court of Peoria County with the crimes of unlawful restraint and deviate sexual assault. The State then filed a petition to have defendant declared a sexually dangerous person pursuant to article 105 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 105—1.01 *et seq.*). While the sexually dangerous person petition (petition) was pending a preliminary hearing was held on the information, and the charges were dismissed for lack of probable cause. Defendant was then indicted and the petition reinstated.

Before trial on the indictment, a bench trial was held on the petition. The trial court found defendant to be a sexually dangerous person. After his post-trial motions were denied defendant appealed. The appellate court, with one dissent, reversed, holding that (1) the trial court had improperly relied upon testimony obtained in violation of defendant's privilege against self-incrimination, and (2) the State was required to prove multiple acts of sexual assault in order to show that defendant was a sexually dangerous person as defined in the statute. (123 Ill. App. 3d 669.) We granted the State's petition for leave to appeal.

On appeal the State raises three issues, but two of these issues present the identical question. They can therefore be condensed as follows: (1) Are *Miranda* warnings required before a defendant may be examined by a psychiatrist pursuant to a court order in a sexually dangerous person proceeding? and (2) Did the defendant waive any privilege against self-incrimination which he may have had? The defendant, on cross-appeal, raises a third issue: Did the State prove beyond a reasonable doubt that the defendant was a sexually dangerous person as defined by statute?

Defendant was formally charged with unlawful restraint and deviate sexual assault. The State then filed the sexually dangerous person petition. With the defendant and defense counsel both present, the court ordered defendant to submit to two psychiatric examinations. No court reporter was present at this hearing, but the written order for the hearing states that the procedure and rights under the sexually dangerous persons statute were explained to the defendant and the defendant indicated that he understood the nature of the proceedings.

On March 4, 1983, the defendant was tried under the petition in a bench trial. The State presented three witnesses, but the defendant did not produce any evidence. The State's first witness was Dr. Bradford Colen, a psychiatrist who had interviewed defendant. Defendant objected to Dr. Colen's testimony, claiming that the doctor had elicited information from him in violation of his privilege against self-incrimination. Aside from some observations about the defendant's appearance and his apparent confusion and vagueness, Dr. Colen's testimony was based almost entirely upon defendant's statements and admissions made during the interview. The trial court ruled that defendant's statements to Dr. Colen were not admissible into evidence, but allowed the doctor to give an opinion based upon his overall interview with defendant. His opinion was that defendant was mentally ill with criminal propensities to commit sex crimes.

The State's next witness was Dr. Mortimer Beck, another psychiatrist, who had examined defendant. The trial judge again refused to allow into evidence the defendant's statements to the psychiatrist, but allowed Dr. Beck to express an opinion which was based "to a great extent" upon defendant's statements and admissions during his interview. Dr. Beck's opinion was that defendant was suffering from a mental disorder and had criminal propensities toward committing sexual assaults.

The State's final witness was Christine Ray, the victim of the alleged assault. Ray worked at a McDonald's restaurant in Peoria, and had noticed the defendant in the restaurant on October 11, 1982. She had spoken briefly to him while she was cleaning tables. After she got off work, at about 6 p.m., she sat down in a booth. Defendant came up and asked Ray if he could join her. She agreed, and the two talked for approximately 30 to 45 minutes. At some point in the conversation Ray described her automobile to defendant and mentioned the general location at which it was parked.

After ending the conversation Ray went into the restroom. When she emerged defendant was no longer in the restaurant. She went out to her automobile, where she discovered that she had left one of the doors unlocked. She got in, started the car, and pulled out of the parking lot. When she stopped at the first stop sign she noticed that defendant was in the back seat of her car.

At this point, Ray testified, defendant asked her to take him to "a romantic place." She asked him where to go and he replied "a romantic place—or else." His tone of voice, she testified, was "kind of threatening type."

At defendant's request, Ray drove to the airport. After reaching the airport she drove around the parking area a few times until defendant told her to pull into the parking lot. She pulled up to the parking gate and opened the door to reach for the parking ticket. As she reached for the ticket defendant reached over and grabbed her on the neck or shoulder. He let go, however, and she got back in the car. Defendant then climbed over into the front seat.

Ray parked the car, and defendant asked her to lift the steering wheel and put the seat back. After doing so, Ray testified, defendant "grabbed me by the legs, set them up in the front seat." He then pulled her to a prone position and lay on top of her, simulating inter-

course even though both were fully clothed.

Next, Ray testified, defendant took off his pants and asked her to take hers off also. She said no, whereupon "he reached for them, tugged them off a little bit. I finally decided to take them off." When asked by the prosecutor why she took off her pants Ray replied, "Due to the fact that he was going to get them off whatever way he wanted, anyhow."

Defendant again simulated intercourse, although Ray was still wearing panty-hose. After a short time he stopped, and asked Ray if she would perform fellatio on him. Ray said no, whereupon defendant insisted that she would. Ray asked if she could leave, to which defendant replied "after he was satisfied." Ray testified that she finally agreed to satisfy defendant if he would let her leave.

Ray then proceeded to manipulate defendant's penis manually. She testified that defendant pushed her head down, forcing her to perform fellatio. She tried to resist but, because of an injury sustained in football while in school, was unable to do so.

Ray then again asked defendant if she could leave, and he agreed. With defendant still in the car she drove to the parking lot gate. Both of them exited the car, and Ray locked the car and entered the terminal to pay the parking fee. While in the terminal she told the woman who took her parking fee that a man had forced her to go to the airport, but Ray testified that she realized that the woman was not going to call airport security. She made no other attempt to summon help before returning to the car. She then gave defendant a ride to a trailer where he said a friend of his lived.

On redirect examination Ray testified that she had asked defendant several times if she could leave, and each time defendant told her that she could not leave until "he got what he wanted." She did, however, admit

that her fear of defendant was based in part upon her experiences with another man:

> "I had a fiancee and he had a drinking problem, and you went along with him, or you might have been dead, and I learned that if you halfway go along with a person to a point, that chances are you will get out of it okay, but it was a fifty-fifty chance, and I was hoping that this guy was, at least, partially like the guy that I had had all my experience with."

In *People v. English* (1964), 31 Ill. 2d 301, this court held that sexually dangerous persons proceedings, while similar to criminal proceedings, were nonetheless essentially civil in nature. This was so even though the interests at stake mandated stricter procedural safeguards than in an ordinary civil proceeding:

> "Since the Sexually Dangerous Persons Act provides for involuntary confinement, although it be for the treatment of the defendant rather than punishment for a crime, it is natural that some of the same safeguards which are applicable in a criminal prosecution be applied to the proceedings under the act. This does not mean, however, that the commitment proceeding is a criminal prosecution or that criminal procedure as a whole must be followed in the proceeding." (31 Ill. 2d 301, 304.)

See also *People v. Studdard* (1972), 51 Ill. 2d 190, 196.

This aspect of *English* has not been affected by subsequent cases. Although the fact that incarceration may result is relevant to the question of whether or not the self-incrimination privilege applies (*In re Gault* (1967), 387 U.S. 1, 50, 18 L. Ed. 2d 527, 558-59, 87 S. Ct. 1428, 1455), it is clear that "the fact that a proceeding will result in loss of liberty does not *ipso facto* mean that the proceeding is a 'criminal prosecution'." (*Middendorf v. Henry* (1976), 425 U.S. 25, 37, 47 L. Ed. 2d 556, 566, 96 S. Ct. 1281, 1289.) In *Minnesota v. Murphy* (1984), 465 U.S. 420, 79 L. Ed. 2d 409, 104 S. Ct. 1136, the Supreme Court applied the principle in *Middendorf* to the

privilege against self-incrimination. After holding that the revocation of probation was not a criminal proceeding, the court then ruled that a defendant cannot claim the privilege merely because his answer to a question might result in revocation of his probationary status. (465 U.S. 420, 435 & n.7, 79 L. Ed. 2d 409, 424-25 & n.7, 104 S. Ct. 1136, 1146-47 & n.7.) However, a defendant may still refuse to answer questions if the answers could be used to implicate him in a separate criminal offense. 465 U.S. 420, 435 & n.7, 79 L. Ed. 2d 409, 424-25 & n.7, 104 S. Ct. 1136, 1146-47 & n.7.

The holding that sexually dangerous persons proceedings are not criminal prosecutions was also not altered by *People v. Pembrock* (1976), 62 Ill. 2d 317. In *Pembrock* this court ruled that because of the liberty interests at stake in a sexually dangerous person proceeding, due process required that the State prove the defendant's status beyond a reasonable doubt. (62 Ill. 2d 317, 321.) This holding has since been incorporated into the statute. (Ill. Rev. Stat. 1983, ch. 38, par. 105—3.01.) *English*, however, recognized that the liberty interest at stake in such a proceeding required strict procedural safeguards, but held that not all criminal procedural safeguards need be applied. (*People v. English* (1964), 31 Ill. 2d 301, 304.) *Pembrock*, which requires only one particular procedural safeguard, is not inconsistent with *English*.

We see no reason now to disturb that part of *English* which held that a sexually dangerous person proceeding is not a criminal prosecution. A person found to be sexually dangerous is to receive "care and treatment *** designed to effect recovery." (Ill. Rev. Stat. 1983, ch. 38, par. 105—8.) Upon recovery the defendant is released from custody and the information or indictment which led to his commitment is quashed. (Ill. Rev. Stat. 1983, ch. 38, par. 105—9.) Since treatment, not punishment, is

the aim of the statute, the legislative determination that the proceedings are civil in nature (Ill. Rev. Stat. 1983, ch. 38, par. 105—3.01) is eminently reasonable. See *Addington v. Texas* (1979), 441 U.S. 418, 428, 60 L. Ed. 2d 323, 332, 99 S. Ct. 1804, 1810; *Tippett v. State of Maryland* (4th Cir. 1971), 436 F.2d 1153, 1159, *cert. dismissed sub nom. Murel v. Baltimore City Criminal Court* (1972), 407 U.S. 355, 32 L. Ed. 2d 791, 92 S. Ct. 2091; *French v. Blackburn* (M.D.N.C. 1977), 428 F. Supp. 1351, 1359, *aff'd* (1979), 443 U.S. 901, 61 L. Ed. 2d 869, 99 S. Ct. 3091; *Cramer v. Tyars* (1979), 23 Cal. 3d 131, 137-38, 588 P.2d 793, 796-97, 151 Cal. Rptr. 653, 656-57; *People v. Poggi* (1980), 107 Cal. App. 3d 581, 586, 165 Cal. Rptr. 758, 760; *In re Beverly* (Fla. 1977), 342 So. 2d 481, 488-89; *Commonwealth v. Barboza* (1982), 387 Mass. 105, 111-12, 438 N.E.2d 1064, 1069, *cert. denied* (1982), 459 U.S. 1020, 74 L. Ed. 2d 516, 103 S. Ct. 385; *In re Matthews* (1980), 46 Or. App. 757, 762, 613 P.2d 88, 91, *cert. denied* (1981), 450 U.S. 1040, 68 L. Ed. 2d 237, 101 S. Ct. 1757; *Moss v. State* (Tex. Civ. App. 1976), 539 S.W.2d 936, 945-48.

The appellate court believed that *People v. Capoldi* (1957), 10 Ill. 2d 261, applied the privilege against self-incrimination to these proceedings. (123 Ill. App. 3d 669, 671.) This interpretation is erroneous, especially since *English*, decided after *Capoldi*, specifically held that the privilege did not apply. *Capoldi* held only that the State must make a preliminary showing as to the voluntariness of admissions sought to be introduced in a sexually dangerous person proceeding. (10 Ill. 2d 261, 268.) Voluntariness and the self-incrimination privilege are separate issues, however, and in this case the in-court warnings to defendant and the fact that he was represented by counsel convince us that the preliminary showing of voluntariness was indeed made. Had the defendant claimed that the statements to the psychiatrists were involuntary

then *Capoldi* might entitle him to a preliminary hearing on the question (10 Ill. 2d 261, 267-68), but since defendant does not claim that the statements were involuntary then *English*, and not *Capoldi*, applies.

The holding that the privilege against self-incrimination is not required in the proceedings in question is supported by the subsequent ruling in *Mathews v. Eldridge* (1976), 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893. *Eldridge* set out the factors relevant to the evaluation of a procedural due process claim:

> "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903.

While the private interest involved in the instant proceeding is great, there are already numerous safeguards ensuring reliability, including the right to a jury trial (Ill. Rev. Stat. 1983, ch. 38, par. 105—5), the requirement of proof beyond a reasonable doubt (Ill. Rev. Stat. 1983, ch. 38, par. 105—3.01), and the right to confront witnesses (*People v. Nastasio* (1960), 19 Ill. 2d 524). The privilege against self-incrimination would add little more reliability to the proceedings, especially since the privilege is not primarily concerned with reliability but is instead designed to check the power of the State over the individual. *In re Gault* (1967), 387 U.S. 1, 47, 18 L. Ed. 2d 527, 557, 87 S. Ct. 1428, 1454.

Finally, the State has a substantial interest in treating as well as protecting the public from sexually dangerous persons, an interest which would be almost totally thwarted by a strict application of the

self-incrimination privilege in such proceedings. If a defendant is allowed to refuse to answer questions asked during the psychiatric interview then it would be nearly impossible for the State to determine whether or not the defendant was sexually dangerous. Since the self-incrimination privilege would be a great burden to the State while being of minimal value in assuring reliability, the *Eldridge* test totally supports the holding in *English* that due process does not require the application of the privilege.

Since there is no privilege against self-incrimination in sexually dangerous person proceedings there is no need for *Miranda* warnings to be given. At this stage no criminal proceeding is involved. Therefore the appellate court's reliance upon *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, is misplaced. In *Estelle v. Smith* the court held that *Miranda* warnings must be given when the defendant's statements to a court-appointed psychiatrist are used against him in the death penalty phase of a criminal prosecution. (451 U.S. 454, 468-69, 68 L. Ed. 2d 359, 372-73, 101 S. Ct. 1866, 1876.) However, if the use of such statements is confined to noncriminal proceedings, no *Miranda* issue arises. 451 U.S. 454, 465, 68 L. Ed. 2d 359, 370, 101 S. Ct. 1866, 1874.

While we agree with the holding in *English* that sexually dangerous persons proceedings are not criminal proceedings, we disagree with the *English* court insofar as it would allow a defendant to refuse to answer questions which may incriminate him. (*People v. English* (1964), 31 Ill. 2d 301, 307-08.) To allow even such a limited privilege would unduly frustrate the purposes of the sexually dangerous persons provisions by making it nearly impossible to identify sexually dangerous persons. Moreover, such a privilege is not necessary to protect the defendant's fifth amendment rights. As *Estelle v.*

*Smith* makes clear, courts may simply exclude the defendant's compelled testimony from use in subsequent criminal proceedings. (*Estelle v. Smith* (1981), 451 U.S. 454, 468-69, 68 L. Ed. 2d 359, 372-73, 101 S. Ct. 1866, 1876.) We therefore hold that a defendant's statements to a psychiatrist in a compulsory examination under the provisions here involved may not be used against him in any subsequent criminal proceedings. Consequently, defendants must answer all questions at such examinations regardless of the possible incriminatory nature of the answers.

Accordingly, the appellate court erred when it barred the use of testimony based upon defendant's statements to Dr. Colen and Dr. Beck. It would have been proper to allow into evidence both the statements themselves and the psychiatrists' conclusions based thereon.

We need not reach the issue of whether or not defendant waived his privilege against self-incrimination. Our holding that he did not have such a privilege in this type of proceeding makes a discussion of waiver unnecessary.

Defendant also argues, and the appellate court apparently agreed, that the statute here involved requires that the State demonstrate more than one actual act of sexual assault or sexual molestation. The State, on the other hand, claims that the statute requires only a showing of "propensity," and does not require that the State prove any actual crime. In our view, neither position is supported by the statutory language.

Section 1.01 of the Sexually Dangerous Persons Act defines sexually dangerous persons as follows:

"All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have

demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children, are hereby declared sexually dangerous persons." (Ill. Rev. Stat. 1983, ch. 38, par. 105—1.01.)

In *People v. Pembrock* (1976), 62 Ill. 2d 317, 321-22, the court construed this language as requiring proof of three separate elements:

"(1) the existence of a mental disorder for more than one year; (2) the existence of criminal propensities to the commission of sex offenses; and (3) the existence of demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children."

It is clear, therefore, that the statute requires more than the proof of mere "propensity"; it also requires that the State prove that the defendant has "demonstrated" this propensity. This language can only mean that the State must prove at least one act of or attempt at sexual assault or sexual molestation.

There is, however, nothing in the statute requiring the State to prove multiple sex crimes. One purpose of the statute is to prevent mentally ill persons from being held criminally responsible for crimes committed while mentally ill. (*People v. Studdard* (1972), 51 Ill. 2d 190, 196; *People v. Sims* (1943), 382 Ill. 472, 476.) It would be illogical to construe the statute to require that a defendant cannot be treated until he has committed more than one assault. Furthermore, the statute is primarily concerned with prediction of the defendant's future conduct; the requirement that the defendant must have "demonstrated" his propensities means only that the commitment order cannot be based *solely* on psychological speculation. We therefore hold that the plural language of the statute—"acts of sexual assault or acts of sexual molestation"—refers to the defendant's future propensities, not to the demonstrated conduct.

We must, however, address the further issue, raised

on cross-appeal, of whether the evidence at trial establishes even one act of sexual assault. Therefore, the sole evidence of a sexual assault was Christine Ray's testimony. Sexual assault, at the time of the alleged crime, required a sexual act achieved by "force or threat of force." (Ill. Rev. Stat. 1983, ch. 38, par. 11—3, now repealed and replaced by Ill. Rev. Stat., 1984 Supp., ch. 38, par. 12—13, which contains a similar requirement.) Defendant claims that the evidence does not establish beyond a reasonable doubt that he used force upon Christine Ray, or threatened her with force. It is for the trier of fact, however, to determine the weight and sufficiency of the evidence, and the reviewing court should not substitute its judgment for the trier of fact unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Molstad* (1984), 101 Ill. 2d 128, 133; *People v. Davis* (1983), 95 Ill. 2d 1, 27.) In this case we are convinced that there was sufficient evidence for the trial court to find that defendant forced Christine Ray to perform sexual acts.

First of all, defendant's unannounced appearance in Ms. Ray's automobile indicated potential hostility, as did his demand for her to drive to a "romantic place—or else." Defendant reached over and grabbed Ray at the parking lot gate when he thought she was trying to exit the car, an action which gave an ominous cast to his repeated insistence that she was not free to leave the car until he "got what he wanted." Under these circumstances the trial court could properly have found a threat of force, and there was no need for Ms. Ray to risk injury by testing out those threats. While Ray's experiences with her former boyfriend may have increased her fear of physical harm, there was adequate evidence for the trial court to find that defendant himself threatened her.

In conclusion, the appellate court erred in barring the

use of testimony based upon defendant's statements to Dr. Colen and Dr. Beck, and also erred in ruling that the State must demonstrate more than one act of sexual assault. In addition, we are convinced that there was sufficient evidence to establish defendant's sexually dangerous status beyond a reasonable doubt. We therefore reverse the judgment of the appellate court and affirm the judgment of the circuit court. We remand this cause to the circuit court of Peoria County for further proceedings.

*Appellate court reversed;*
*circuit court affirmed;*
*cause remanded.*